## GARRETT, ET AL. *v.* GRAY, ET UX.

[No. 376, September Term, 1969.]

*Decided June 4, 1970.*

364

The cause was argued before HAMMOND, C. J., and MCWILLIAMS, FINAN, SINGLEY, SMITH and DIGGES, JJ.

*John A. Buchanan,* with whom were *Sasscer, Clagett, Powers & Channing, David A. McNamee* and *Beatty & McNamee* on the brief, for appellants.

*Robert Y. Clagett,* with whom was *David H. Gwynn* on the brief, for appellees.

FINAN, J., delivered the opinion of the Court.

This proceeding was instituted by the filing of a bill of complaint in the Circuit Court for Prince George's County, whereby the appellants sought a mandatory injunction to compel the appellees to open a road (the farm road) that had been barricaded by them. The road in question is a meandering dirt road, averaging about 12 feet in width which runs generally east and west, for a distance of 2 9/10 miles between Crain Highway (old Route 301) on the east and Osborne Road on the west, both being public roads.

The farm located in Prince George's County, now owned by the appellees and for many years known as the Osborne farm and through which the road in question runs, was originally owned by Thomas Clagett. He also owned the adjoining farm to the east known as Weston farm (now owned by Hal C. B. Clagett) which latter farm lies between Osborne farm on the west and the old Crain Highway on the east. In the early 19th century Thomas Clagett devised the Osborne farm of 336 acres (being the same 336 acres later acquired by the Fords) to his daughter, Adeline Clagett, and provided in his will for the following right of way:

> "* * * it is my will and desire that the road running from the main road in front of my home place to Osborne Farm, shall remain open as it now stands, for the use and benefit of the owner or owners of the Osborne Farm forever."

During the year 1914, the Ford family became tenants on the Osborne farm and through mesne conveyances acquired title to the 336 acres. The first parcel of 168 acres on the north side of the farm road was acquired in 1921 and the second parcel on the south side of the farm road was acquired in 1929. From this latter date until 1960, the Ford family owned, lived on and farmed this property; during this period they sold off several parcels. In 1960, three of the appellants—the Fords, being then record owners of title to 225 acres of the farm—sold what remained of the farm to Ralph A. Gray, Jr. and Jean W. Gray, his wife, the appellees, by a general warranty deed. The grantors were Richard Benjamin Ford and Mabel P. Ford, his wife, and James T. Ford and Alice M. Ford, his wife. Richard Benjamin Ford is now deceased. The deed from the Fords to the Grays dated September 22, 1960, and recorded in Liber 2488 at Folio 209, among the Land Records in the Office of the Clerk of the Court for Prince George's County, contains the following language: "Together with * * * all and every, the rights, alleys, ways, waters, privileges, appurtenances, and advantages to the same belonging or in anywise appertaining." In June of 1961, the appellees conveyed back to James T. Ford and Alice M. Ford, his wife, 2.06 acres and conveyed back to Richard Benjamin Ford and Mabel P. Ford, his wife, 2.23 acres. Both of these parcels were part of the 225 acre tract sold to the Grays and are located on the road in question. Each of these deeds back to the Fords were prepared at the request of the appellees from a survey commissioned by them and each contained the following language: "The above described lot shall have the same right of usage over the farm road east to Route 301 [Crain Highway] as is now vested in the whole farm." The chancellor in his opinion emphasized that this express grant of easement did not give to the Fords the right to travel the farm road both east and west for purposes of egress and ingress but only east.

The conveyance from the Grays to the Fords of the two "2 plus" acre parcels was pursuant to a contract dated

September 22, 1960, and recorded in Liber 2488 at 212. The Grays agreed to reconvey to the grantors in the deed referred to above 30 acres at $115.00 per acre. It was also agreed that the Grays would erect two dwelling houses for the Fords at an expense not to exceed $7,000 per house. A release dated February 9, 1963, signed by Richard Benjamin Ford, Mabel P. Ford, James T. Ford and Alice M. Ford, asserted that they have "* * * released and forever discharged and by these presents do hereby remise, release, and forever discharge all our claim, right, and interest in and to the [property described in the deed recorded in Liber 2488 at 209] arising by virtue of a certain contract of sale * * *" recorded in [Liber 2488 on page 212].

After the death of Richard Benjamin Ford, Mabel P. Ford sold one-half acre lots to the appellants-Garretts and the appellants-Wilkersons. Both the Garretts and Wilkersons are relatives of the Fords. The lots were part of the 2.23 acres owned by Mabel P. Ford and both lots are located on the farm road and are improved with houses where the Garretts and Wilkersons live.

Entered in evidence by stipulation was a survey dated April 13, 1961. This survey shows the Gray farm, the property the Grays conveyed to the Fords, the 77.76 acres owned by the Hamiltons and the 36.17 acres owned by the Diehlmans.[1] It also shows the farm road running through the Gray farm and terminating on the west at Osborne Road. Also, a map of the County published by the Maryland-National Capital Park & Planning Commission shows the road in question.

As indicated, after acquiring the Ford farm the Grays barricaded the road. The date of the barricading is disputed. According to the appellants the road was not closed until April of 1966. According to the appellees, the road was closed in 1961. By a letter dated October 7, 1966, from attorney James R. Bucher to Ralph A. Gray, Jr.,

1. Charles E. Hamilton and Ellen M. Hamilton, his wife, voluntarily withdrew as appellants and the court accepted their withdrawal prior to the commencement of the hearing.

written on behalf of Perry L. Garrett, Mr. Gray was requested to remove the obstruction in the road on the premise that the road had been in continuous use for over twenty years. By letter dated May 2, 1968, from attorney David A. McNamee to the appellees, they were advised that in the event the barricades were not removed, legal action would be necessary to open the road to public use. The bill of complaint was filed on October 30, 1968.

Twelve witnesses testified on behalf of the appellants. In summary, this testimony showed the existence of the road, its use by the appellants, their friends and relatives as well as its use by the public in general from at least the year 1914. The appellants' theory of the case was that the farm road was dedicated to public use, accepted by the public, and that as a result the road is now in the public domain.

The appellees on the other hand contend that the evidence supported nothing more than to show that the farm road was a private road and that testimony that strangers occasionally and infrequently used the farm road was not sufficient to show public acceptance of the farm road. The arguments of the appellees may be summarized as follows: (1) failure on the part of the appellants to prove adverse usage inuring to the benefit of themselves or the public; (2) failure to establish an implied or express grant of right of way; (3) estoppel on the part of the appellants by virtue of the conveyance the Fords had made to the appellees; and (4) laches on the part of the appellants.

The chancellor below found in favor of the appellees and dismissed the bill of complaint. He said that although laches may exist he was not going to decide the case on that basis and in an oral opinion stated in pertinent part:

> "Now, the gist of all of the evidence and the overwhelming weight of the evidence as to the use of this road was that it was for the use of Adeline Clagett, to start with, to go from there through Weston Farm. Then when the Fords

first became tenants, they used both ways. When they got their deeds to the entire piece of 336 acres, they used both ways. When they conveyed to Hamilton, they were still using both ways and then finally, this is really repetitious, in the deed to the Grays they conveyed all the interest they had in the farm.

"Now, this is going again to the defense in the Answer that the Plaintiffs have an adequate right-of-way to a public road without using the Defendants' land, which we find is a fact that they do.

"Eleven. That the Plaintiffs abandoned all interest they had, if any, when they and/or their predecessors in title sold and conveyed the Ford farm to the Defendants, which we have already determined as so.

"Twelve. That said alleged right-of-way has been abandoned through nonuse together with exclusive dominion of said land by the Defendants. We think this is true and that the evidence shows this on the basis of the weight, the main weight of the evidence, although there was an occasional use.

\* \* \*

"Certainly there is no way of necessity here. There are no elements of prescription shown from the time of the conveyance of the Fords to the Grays. Some mention has been made of an implication, but we know of no authority by implication, and if it were so, we do not see that the evidence bears this out.

\* \* \*

"There is reference made by counsel to the quasi-public [easement] I have never heard of the public referred to as quasi-public, but I will accept that, but I do not understand it. Either it is fish or fowl. I have heard of quasi-public corporations, but I don't believe I have heard of

the quasi-public [roads]. It is either a public or private way, and it never was, in the Court's opinion, anything but a private way. Maybe an occasional person went through, but overwhelmingly the evidence from the Plaintiffs' witnesses themselves was that it was a private way for their friends going and coming in either direction."

Although aware that Maryland Rule 886 a provides that we are not to set aside the judgment of the lower court on the evidence unless it is "clearly erroneous," we are of the opinion that in the instant case we must reverse the decree of the learned chancellor, wherein he dismissed the appellants' bill requesting the mandatory injunction enjoining the appellees from barricading the farm road. In reaching our conclusion, however, we do so without adopting the theory of the case advanced by the appellants, namely, that the "evidence showed an implied dedication of the road to the public and acceptance by the public through uninterrupted use." We cannot find from the evidence support for this "dedication" theory.

However, contrary to the opinion of the lower court, we do believe that the testimony spells out the existence of a public way predicated on the uninterrupted use by the public for over twenty years.

Although the chancellor did not find any use by prescription insofar as the public was concerned, we think his opinion was colored by the concept he formed that (using his language) the appellants "abandoned all interest they had, if any, when they, and/or their predecessors in title, sold and conveyed the Ford farm to the defendants [appellees] * * * and that * * * the right of way has been abandoned through nonuse together with exclusive dominion of said land by the defendants."

We think that the evidence establishes the fact that the farm road is a public road. Accordingly, we do not think that the conveyance by Richard B. Ford and Mabel Ford, his wife, and James T. Ford and Alice M. Ford, his

wife, to the Grays, acted as a surrender or release of their rights as members of the public to use a public road simply because the deeds had the usual appurtenance clause, namely, conveying "all and every the rights, alleys, ways, waters, privileges, appurtenances, etc." Certainly, such a conveyance could not affect the rights that the general public acquired in such a road, or that the Fords as members of the general public would have acquired in such a public way. Compare also *Fowler v. Matthews*, (Tex. Civ. App.) 204 S.W.2d 80 (1947).

Not only did the appellees fail to meet this burden but, in our opinion, the overwhelming testimony supports the characterization of the road as a public road. It would appear that from the year 1914, the date from which the appellants endeavored to establish their case, that the farm road was used by the general public and that competent testimony supports this contention. The numerous witnesses produced by appellants, as well as several of the appellees' witnesses, support the argument of use by prescription. Without unduly prolonging this opinion we think it appropriate to set forth in capsule form the testimony of the witnesses:

Hal C. B. Clagett, Jr., Esquire, testified that the road runs from Osborne Road through the property of the appellees and then through his property, known as Weston Farm, to old 301. He stated the road has been in existence all of his life and that his memory of the road goes back 48 years. He has used the road on many occasions, both on horseback and in cars. In the winter the road was not passable at times, but other than on those occasions, the road has always been passable. Despite his frequent use of the road he never asked for nor was he ever denied permission to use the road. He put the date of barricading as 1966. Mr. Clagett stated that while he never thought the road in question was public, he did believe that the gates on the road could not be locked so as to bar ingress and

egress and the road was supposed to be open to the use of owners along the road.

Walton G. Banks stated he first became familiar with the road in 1938, while making surveys in the area and while horseback riding for pleasure. As a surveyor, he had seen aerial photos of the property which clearly showed the road. While the road was narrow and not paved, it was usable by automobile.

William Carroll and Robert Carroll both testified that they became familiar with the road 45 or 50 years ago and that it ran from 301 to Osborne Road. They are related to the Fords and both lived on the farm for many years. They stated that they were never asked by anyone for permission to use the road and said that the road was used by others for its entire distance.

James T. Ford, age 60, moved onto the property in 1914. The road ran from old Route 301 to Osborne and was used by the Ford family in both directions for its entire length. He stated there were about four gates on the road but that they were never locked. He testified that he met many strangers on the road but that nothing was said to them regarding use of the road. John P. Ford, age 38, who was born on the farm gave much the same testimony.

Mabel P. Ford, age 66, stated she has been familiar with the road and the property for 45 to 50 years. No one asked her for permission to use the road and no one was denied permission. On cross-examination she stated that because of the barricades, it is difficult to conveniently get from the Hamilton property to her home as one must travel a much greater distance.

Charles E. Hamilton who was an original plaintiff with his wife, but who withdrew at the start of the case, testified that he owns 77 acres west of the Gray farm on the north side of the

road. He has been familiar with the road for 30 years and that he acquired his property from the Fords in 1950 and the road has always run from old 301 to Osborne Road. Mr. Hamilton stated that at the present time he could use the road east to old 301 and that Mr. Gray has never stopped him on the road nor has he ever asked permission to use the road.

Herbert Wilkerson, age 40, stated he now lives in a house on the east side of the Gray property at the border of Weston Farm. He first saw the road 20 years ago and it ran from 301 to Osborne Road.

Richard C. Waters, who had at one time worked for Mr. Gray, put the date of the barricade as 1967 or 1968, and stated the road was always open prior to its being closed by the appellees. He stated on cross-examination that he first used the road 15 or 16 years ago in a passenger car to get to Weston Farm where his grandfather worked.

Perry L. Garrett moved into a house on the road in 1964. He said a chain was put up by Mr. Gray in 1964 and the barricade in April of 1966. At that time he was stationed at Andrews Air Force Base and that it was much shorter to get to work by using the road to Osborne Road. He stated his daughter, Katie, babysits for the Diehlmans and to pick her up, if the road is blocked, he must travel a much greater distance. If the road were open, he would have to travel only .7 of a mile.

Katie Garrett testified that in April of 1965, she was confronted by Mr. Gray and a policeman at a chain across the road and advised that she was on private property.

Six witnesses were called by the appellees. Harold A. Simmons stated the road has been in existence for 60 years and was open its entire

length after purchase by the Fords. While the road was rough, it was passable in a motor vehicle. He stated that there were about four gates on the road, but that these were never locked and were only for livestock control.

John P. Smith now retired from the State Roads Commission, said he used to hunt over the road on many occasions, starting in the 1920s. While he asked permission to hunt, he never asked permission to use the road.

Joseph H. Mitchell now lives across the road to the west from the appellees. For nine years he resided on Weston Farm and would use the road to the west as the shortest route to Marlboro Pike. He knew of no one being denied use of the road. Mr. Mitchell stated that the road never varied as to its location. He said that on one occasion he dug gravel on the Ford farm and was asked to stop by the Fords.

John Randall stated he has lived on Osborne Road for 15 years. He first became familiar with the road about 1930 or 1931. While the road was somewhat overgrown, it was passable by car. As a child, he rode his bicycle over the road to Marlboro.

Mr. Ralph A. Gray, Jr., a defendant and appellee, stated that at the time that he and his wife purchased the Osborne farm, Mr. Benjamin Ford and James T. Ford left him under the impression that the farm road was a private road and that it was for their right and use only and their successors in title. He also stated that one of the Fords assisted him in erecting the gate posts and gates that he put up. He further contended that he first closed the road to public use by placing a chain across it in 1961, which he locked or left unlocked to suit himself. He described the farm road as practically impassable when he purchased the Osborne farm in 1960.

In *Smith v. Shiebeck,* 180 Md. 412, 24 A. 2d 795 (1942), Judge Delaplaine discussed in some depth the doctrine of adverse user, as well as that of an implied grant. As we have previously stated, we do not believe the doctrine of implied grant, or implied dedication, is applicable to the case at bar, nor do we think it need be applicable under the facts of this case to support the finding that the farm road is a public way. There would certainly be no basis in the instant case to imply the grant of an easement predicated on its being reasonably necessary to the enjoyment of the land owned by the appellants, *Dalton v. Real Estate,* 201 Md. 34, 46-47, 92 A. 2d 585 (1952), as we are not here involved with "landlocked" property owners, although the use of the road would offer a greater convenience to the appellants. We do think that what this Court said in *Smith v. Shiebeck, supra,* regarding "adverse use" is relevant:

> "* * * It is a familiar principle that to establish a right of way by prescription it is necessary to prove an adverse, exclusive and uninterrupted use of the way for twenty years. The term 'adverse use' means use without license or permission, for an adverse right of an easement cannot grow out of a mere permissive enjoyment. Where, however, a person has used a right of way for twenty years unexplained, it is fair to presume that the use has been under a claim of right, unless it appears to have been by permission. In other words, the use of a way whenever one sees fit over the land of another, without asking leave is an adverse use, and the burden is upon the owner of the land to show that the use of the way was by license or contract inconsistent with a claim of right. *Cox v. Forrest,* 60 Md. 74; *Waters v. Snouffer,* 88 Md. 391, 41 A. 785; *Hansel v. Collins,* 180 Md. 209, 23 A. 2d 686." 180 Md. at 419.

See also *Clayton v. Jensen,* 240 Md. 337, 342, 214 A. 2d

154 (1965) ; and *Wilson v. Waters,* 192 Md. 221, 225, 64 A. 2d 135 (1949).

Recently, ·Chief Judge Hammond writing for the Court in *Mt. Sinai v. Pleasant Manor,* 254 Md. 1, 253 A. 2d 915 (1969), presented a meaningful discussion of the synthesis of prescriptive rights as they relate to the doctrine of adverse user, a pertinent part of which we think apposite to the case at bar :

"The texts and the cases reveal that a right in the public to travel over a road or a way may arise by acceptance, evidenced by long continued user by the public, of an offer to dedicate a road to the public. *There is another rule of law, which sometimes in an opinion seems to blend into, reflect or overlap the rule as to acceptance by user of an offer of dedication. The second rule, the one now relied on by the appellants, is that 'irrespective of the question of intention, uninterrupted use by the public may give the public an irrevocable right. This result follows not because an intention to dedicate is conclusively presumed, but because by the lapse of the statutory period [twenty years] a perfect title by prescription [to an easement in gross] vests in the public.'* Frank, Title to Real and Leasehold Estates (1912) p. 203. II American Law of Property § 9.50, pp. 483-486; 4 Tiffany, Real Property (Third Ed.) §§ 1211-1216. In *Thomas v. Ford,* 63 Md. 346, Chief Judge Alvey for the Court said at pp. 351-352 :

'It is certainly a settled doctrine in this State that public roads or ways of any kind can only be established by public authority, or by dedication, or by long user by the public, which, though not strictly prescription, yet bears so close an analogy to it that it is not inappropriate to apply to the right thus acquired the term prescriptive. Hence the ex-

istence of a public way may be established by evidence of an uninterrupted user by the public for twenty years; the presumption being that such long continued use and enjoyment by the public of such way had a legal rather than an illegal origin. *Day v. Allender*, 22 Md. 511.'" 254 Md. at 5 and 6 [Emphasis supplied]

See 10 Maryland Law Review 272 (1949) at 276, wherein the author notes that the tendency in modern decisions is to disregard the fiction of the lost grant and to develop a more positive, simpler and direct approach by analogizing adverse user with the application of the Statute of Limitations.

The chancellor dismissed the user by the many witnesses who testified below as "permissive use." However, we think the use would more appropriately be characterized as use by "acquiescence." In *Dalton, supra*, we said:

"* * * and *Burnham v. Burnham*, 130 Me. 409, 156 A. 823, where the court held that a father's failure either to protest against a son's use of a right of way, or to show clearly his consent, was evidence of acquiescence in the adverse use and not of permission, saying further that the relationship of the parties might be considered as a factor, but was not conclusive as to whether the use was permissive or adverse." 201 Md. at 45.

\* \* \*

"* * * Mere failure to protest is not permission but acquiescence. *Tiffany*, work cited, Section 1196. In *Alstad v. Boyer*, the Minnesota case cited above, the Court expressed it as follows [228 Minn. 307, 37 N.W.2d 376]:

'*Acquiescence* is the inactive status of quiescence or unqualified submission to the hostile claim of another, and is not to be confused

> with *permission,* which denotes a grant of permission in fact or a license.'
> See also *Burnham v. Burnham* (Maine), *supra,* [156 A. 823]." 201 Md. at 50.

In the instant case the record reveals the use by members of the public of a meandering dirt road, which ran from one public highway to another, without objection from 1914 to 1961, when apparently the first objection to its use was lodged. Cf. *Easter v. Overlea Land Co.,* 129 Md. 627, 632, 99 A. 893 (1917). True, the traffic may have been sparse; nonetheless, members of the public freely passed over it without seeking permission of the owners through whose property the road passed, and it was a continued and uninterrupted use by persons other than the property owners whose property is traversed by the road.

In *Department of Public Works & Buildings v. Farina,* 29 Ill. 2d 474, 194 N.E.2d 209 (1963) the Supreme Court of Illinois stated:

> "Public use requires that all persons must have an equal right to the use and that it must be in common, upon the same terms, however few the number who avail themselves of it. (*People ex rel. Tuohy v. City of Chicago,* 394 Ill. 477, 68 N.E.2d 761.) The law is well settled that a public road is a public highway regardless of the number of people who use it if everyone who desires may lawfully use it, as it is the right of public travel and not the exercise of the right which constitutes a road a public highway."

See also *Anderson v. Birkeland,* 38 N.W.2d 215 (Minn., 1949); *McHenry v. Foutty,* 60 N.E.2d 781 (Ind., 1945); and *Scruggs v. Beason,* 20 So. 2d 774 (Ala., 1945).

For the reasons we have stated in this opinion we think the farm road is a public way and that the chancellor erred in denying the appellants' request for injunctive relief.

Finally, the chancellor below suggested that laches may exist on the part of the appellants but made no affirmative finding to that effect. On the theory of the case upon which this opinion is based, namely that the public had acquired a right to use the road through prescription, the doctrine of laches would be inapplicable.

> *Order reversed, and case remanded for passage of a decree in conformity with this opinion, appellees to pay costs.*