## GREEN ET AL. *v.* WASHINGTON SUBURBAN SANITARY COMMISSION ET AL.

[No. 19, September Term, 1970.]

*Decided October 14, 1970.*

The cause was argued before HAMMOND, C. J., and BARNES, McWILLIAMS, FINAN, SINGLEY, SMITH and DIGGES, JJ.

*Douglas R. Taylor* and *Alger Y. Barbee,* with whom was *R. Edwin Brown* on the brief, for appellants.

*James S. McAuliffe, Jr.,* with whom were *Heeney, McAuliffe & McAuliffe* on the brief, and *Paul T. Sisson* for appellees Washington Suburban Sanitary Commission and Errol W. Jeffcoat.

James F. Couch, Jr., with whom were *Couch, Blackwell & Miller* on the brief, for appellee Marbro Company, Inc.

*Laurence T. Scott* for appellee Laurence Smith, Jr.

*Joseph B. Simpson, Jr.*, with whom were *Simpson & Simpson* and *George Seymour Morgan* on the brief, for appellees Carlton R. Bohrer and Claude Pickett, Jr.

No brief filed for appellee David Rooney.

DIGGES, J., delivered the opinion of the Court.

The fracas that resulted from Harry Green's attempt to prevent the Washington Suburban Sanitary Commission from laying a water line along the roadway in front of his home in Damascus, Montgomery County, Maryland should not serve as an example of how to combat the encroachments of state and county government into the far reaches of suburbia. Had this been a less volatile situation we might only have been faced with the relatively uncomplicated question of the widening of the public's right-of-way over a roadbed by adverse possession; instead we must review this question in the context of a free-for-all which resulted in eleven days of trial against seven defendants over sixty-nine tort claims, including assault, battery, false imprisonment, malicious prosecution, trespass quare clausum fregit, trespass de bonis asportatis, and an alleged conspiracy to commit all these offenses against the persons and property of the appellants and plaintiffs below, Mr. and Mrs. Harry Green.

At a jury trial in the Circuit Court for Montgomery County before Judge Joseph M. Mathias, the Greens, along with a host of witnesses for the defendants, reconstructed the events leading up to this case: In early 1967 Mr. Green became aware that the Washington Suburban Sanitary Commission was planning to lay a water line along Maryland Route 122, or Bethesda Church Road. A portion of Route 122 ran through Mr. Green's property, with his home and shop on the north side of the road and a storage

area for his well digging equipment and trucks on the south. No one contests that Mr. Green held title to the underlying fee below the road. The dispute at the core of this case was over the width of the State's right-of-way for a public highway. The section of the road in question had first been paved with a strip of concrete which varied in width from fifteen to eighteen feet as it passed through the Greens' property. This was done in 1924. At that time the State neglected to obtain a deed for its customary forty-foot right-of-way from the prior owners, although it had obtained deeds from the adjoining owners. Mr. Green contended that this omission left him with complete title to the land up to the very edge of the concrete from the day he acquired the property in 1935 to the time of this case in 1967. The State introduced evidence to demonstrate that during the intervening forty-three years, from 1924 to 1967, it had nevertheless maintained what it considered to be its customary forty-foot right-of-way over this property. There was also evidence that the public, primarily by pedestrian traffic, had continuously traveled over this broader right-of-way. Both of these activities occurred regularly without objection from the Greens or their predecessor in title. Finally, the State had widened the concrete portion of the road in 1957 with macadam strips, again without objection from the Greens.

Unaware that the State may have acquired title to the broader right-of-way by adverse possession, Mr. Green objected when he learned that the Sanitary Commission proposed to lay a water pipe along the north edge of the road, through what he considered to be his front yard. He retained a lawyer to notify the Commission of his objections and to offer, free of charge, the use of his property on the south side of the road for the pipeline. The record is unclear as to why he preferred the south to the north side but it appears that the genesis of this predilection may have been a concern over two large oak trees very close to the north edge of the road. But be that as it may, whether it was ecology or a desire to pro-

210

tect one's property against governmental encroachment, Mr. Green had his lawyer adamantly inform the Sanitary Commission in a letter of March 28, 1967 that he would "not voluntarily give an easement on the north side of Bethesda Church Road" nor would he "permit a pipe to be laid, or any construction work done by the commission within the boundary of his property until this matter is resolved." To this unequivocal statement of position neither client nor attorney received a reply.

Instead Mr. Green noticed surveyors staking out the proposed trenchline along Route 122. Then pipe and heavy equipment were placed along the route, and digging, further up the road, began. By the afternoon of Friday, April 28, it became apparent that the trench was making an obvious bee line for the north side of his property and that the workmen had no intention of zigzagging across the road to the south side. On Monday, May 1, the digging of the trench in front of his home would have begun had not Mr. Green taken the simple expedient of parking his entire fleet of trucks along the north side of the road directly in its path. This blockade included "one small drill, one large one next to it, and a flatbed '54 truck and one large cable rig drill." One of the vehicles making up the barricade weighed "about twenty-five tons," according to Mr. Green, who also testified that he parked the trucks "just off the pavement. . . . Off the edge of the macadamized surface on my property. It might have been in the road but I would still have been on my property, so I parked them right on the edge of the road, just off the edge of the road on my property." Mr. Green then slipped away from the scene of battle, leaving his wife behind to guard the property. He was not to return until one o'clock that afternoon.

When the defendant Laurence Smith, the foreman of the work crew, arrived at the job site that morning he discovered, much to his consternation, this imposing obstacle to further digging. Unperturbed, however, he called his superior at the Marbro Company for direction. The Marbro Company, one of the defendants below, had been

awarded this construction contract by the Sanitary Commission. His superior advised him to call the state police for assistance and, if necessary, to "leap frog" over the blocked portion of the right-of-way so as not to delay further digging. In response to Smith's call, Maryland State Trooper David Rooney, another defendant, arrived. After consulting with Smith and a Sanitary Commission inspector, defendant Errol Jeffcoat, he told Mrs. Green to remove the trucks or he would have them towed away. She refused. After morning long consultations over maintenance plats with officials of the State Roads Commission, Rooney marked off the north half of the forty-foot right-of-way by measuring out twenty feet from the center of the concrete road. Having determined that Green's equipment was illegally blocking the right-of-way, he called for a tow truck owned by the defendant Carlton Bohrer, trading as the Walnut Hill Shell Station, and operated by yet another defendant, Claude Pickett, Jr. At this juncture Mr. Green returned. Although there are some minor disputes over the details, especially with regard to the assault on Mrs. Green, the parties accept the Greens' version of what next occurred. Rather than paraphrasing, we quote from Mr. Green's narration of the events:

[Trooper Rooney] came over and asked me, he said,

"Are you going to move this equipment? I told him, "No, it is parked on my property." I told him, "You have no right to move it."
Q. [By Mr. Barbee] What did he say to that? A. He said, "If you don't move it we are going to tow them away." I said, "You can't tow them away because you don't have any legal authority." He said they were going to tow them.
Q. On whose property were these vehicles parked? A. On mine.
\* \* \*
Q. Mr. Green, what transpired thereafter following this conversation you had with the

trooper? Tell us in your own words. A. What I did?

Q. Yes, sir. A. The conversation with the trooper, of course, I hadn't read the day's news so I went in the house and got one of the newspapers, crawled in the back of the truck and sat and was reading it for twenty or thirty minutes and here came a tow truck.

Q. Who drove the tow truck? A. That I wouldn't know.

[It was Mr. Pickett.]

* * *

Q. Go ahead. A. So the trooper instructed the tow man to pick up the small drill which was parked, the first vehicle coming down from Damascus, or the one on the east end. I am right particular about my equipment, so I went out there and jumped in it and cranked it up and the trooper, he got pretty hot with me, he came in the door after me and said I couldn't move it.

He was going to tow it away. I said that he had no business touching it. So I backed up the truck a little further from the pavement.

They say I hit a tree, which I didn't because my derrick would be damaged. They said I recklessly drove. I had to gun the truck pretty heavy to get a cold engine started up to move four or five times. I backed up twenty or thirty feet from the road.

He told the tow wagon man to get the blue truck. I crawled in the truck. I looked around for the keys. There were no keys. That is when I found out my wife had gotten the keys. I told one of my men who came in after that to go and get the keys in the house. We had a pile of them in the house.

He grabbed one of them and came back and I seen he had the wrong ones. I told him to get the other ones. In the procedure of him getting this

key the tow wagon backed up katty-kornered on my property, and in order to back into the front of it. Of course, he pulled up the hood.

Q. Who raised the hood? A. He raised the hood and pulled the wire. He put the hood back down. I raised the hood and put the wire back in and got back in the truck. He raised the hood again and pulled it back in the second time.

I got out of the truck and put it back in and started back, but didn't get back from the front. He raised the hood and pulled the wire the third time. The second time that I went to pull the wire he pulled me back a little bit, but I didn't pay any attention to it.

The third time when I raised the hood and put the wire in and went to step back, that is when the trooper grasped me and tried to put a hammerlock on me.

I snatched away from him and I stepped back a little way from him. He reached behind him and, with something. I didn't know what it was until I saw it was a blackjack.

I was ducking, and he caught me first on one side of the head and once on the other side. Then he hit me in the nose one solid lick and one solid lick on my left right side of the back. It was right near the ear. . . .

My knees buckled up under me. I started down and I was ascared to run. I figured he would shoot me if I ran. I was only about thirty feet from the house door and about twenty-five feet from the shop door and if I would have run I was afraid he would shoot me. There wasn't anything else to do but stand there and take it. I had to run or try to defend myself. I reached up and grabbed him. I took a handful of shirt, tie and everything. I put my left arm around his neck and I gave him a good gentle hug. He started hollering, "Somebody help me."

We kept backing up about ten or fifteen feet. While he was blackjacking me, my wife came out there and said for him not to do that. He swung at her with the blackjack. He caught her on the arm, a right good lick.

I don't know whether he kicked her on the foot or not. She had a bad place on the ankle. We went down and I am still holding him while he was down. The foreman that was on the road . . .

Q. What is his name? A. Smith. He says I am going to help him. They said, "No, you stay out of it." I remember that.

  \* \* \*

Q. What did he do? A. He came over while we were down there. He came over there and pulled the cop's gun and threatened to blow my brains out.

Q. What did he say? A. He says, "You let him up or I will blow your damn head off, blow your brains out."

Q. Where was the gun? A. The gun was in his hand against my head.

Q. What happened then? A. I never let loose. I said it would be the last person he ever killed. I never let him loose. About that time, I think two more State Troopers came. I think there were two more. They snatched us apart and pulled us up, two of them. They tried to put the handcuffs on me and they couldn't make it. The third one got up and put a hold on me. They had me down on my back. Then one stood on my neck and one stood in the middle of my back and jumped up and down while the third one put handcuffs on me.

The rest is anticlimax. During the course of the scuffle Mr. Pickett hooked up his tow truck and drove off with the flatbed truck. The police took Mr. Green into cus-

tody, booked him and took his photograph and finger-prints, but at a later trial in the Montgomery County People's Court he was acquitted of the charges of disorderly conduct and assault and battery.

Mr. and Mrs. Green brought suit in the Montgomery County Circuit Court against all of the named participants, and they have now appealed, with the exception of a judgment in the amount of $200.00 against Officer Rooney for assault and battery, from generally unfavorable verdicts. They did obtain a judgment against the foreman, Mr. Smith, for nominal damages ($.01) for his use of the gun to stop the fight. But they now question an instruction in this regard that precluded actual damages for this assault.

The jury's verdict was in favor of the Washington Suburban Sanitary Commission and the Marbro Company as to trespass to real property; in favor of Trooper Rooney for false imprisonment and malicious prosecution of Mr. Green and assault and battery as to Mrs. Green; in favor of Pickett and Bohrer for trespass to personal property for towing away the truck; and, again, in favor of the Sanitary Commission for continuing trespass for leaving the water pipes in the ground. The Greens had charged that the defendants had acted jointly and severally in the commission of the alleged offenses, but either by directed verdict or by the jury's verdict the record shows that, except for the two adverse judgments, the other defendants have been exonerated of all charges. The Greens have only appealed selectively from that result. They have appealed generally, however, from a direction of the verdict in favor of the Washington Suburban Sanitary Commission, its agent Jeffcoat, the Marbro Company, Laurence Smith, and Officer Rooney for conspiracy to commit trespass to real and personal property and assault and battery against both Mr. and Mrs. Green, as well as malicious prosecution and false imprisonment against Mr. Green.

## THE MOTION TO DISMISS

With such a multifaceted appeal it is not surprising

that the first matter with which we must deal is a motion to dismiss filed by the defendants Pickett and Bohrer, the operator and the owner of the tow truck. They contend that none of the questions on appeal relate to them nor ask for any relief against them. We agree.

The appellants have only questioned the correctness of the court's instructions on trespass q.c.f., damages and the direction of the verdict on the conspiracy counts. Pickett and Bohrer had received a directed verdict in their favor on trespass q.c.f. before the instructions on that phase of the case were given to the jury. Even if those instructions were erroneous they would not reverse these directed verdicts. As for the conspiracy counts, their names are conspicuously absent from the list of alleged co-conspirators. Hence, any error in this regard would be of no consequence as to them. Finally, having been exonerated by the jury of trespass d.b.a. (for removing the truck) and by the court of all other charges, any error in the instructions to the jury on damages would be moot as far as Pickett and Bohrer are concerned.

## THE DAMAGE CLAIM AGAINST LAURENCE SMITH

Another phase of this appeal that can be disposed of briefly is the question of damages for Smith's assault on Green. Judge Mathias instructed the jury that they could return nominal and punitive damages against Smith for pointing the gun at Mr. Green, but the judge indicated that he could recall no proof of actual damages caused by that act. The relevant portion of his instruction to the jury is as follows:

> "The law says that every injury to the rights of another imports damages. So even though you may find there was no actual damage proven by Mr. Green that resulted from the pistol being pointed at him, if you believe that Mr. Smith was wrong in what he did and that he should be liable to Mr. Green, you may award nominal damages of one cent, and then you may also

"consider whether or not to award punitive damages."

Mr. Green now complains that this in effect was an instruction which precluded the jury from considering actual damages for the assault with the pistol. Assuming that this accurately portrays the inference the jury could have drawn from Judge Mathias' instruction, we detect no error.

An assault is one of those technical invasions of a person's bodily integrity which entitles him at least to nominal damages. He is not entitled to an additional compensatory award unless he can show actual damages from either demonstrable bodily injury or some form of subjective injury such as mental anguish, fright, humiliation, or pain and suffering. *Bugg v. Brown,* 251 Md. 99, 103-06, 246 A. 2d 235 (1968); *Mason v. Wrightson,* 205 Md. 481, 488-89, 109 A. 2d 128 (1954); Prosser, *Law of Torts,* § 9 at 33-35 (1964). See also *Peroti v. Williams,* 258 Md. 663, 267 A. 2d 114 (1970). The plaintiffs have shown us no authority which suggests that actual damages, however intangible, can be awarded without some proof, suggestion, inference or basis in fact indicating more than a technical violation of the plaintiffs' rights. After a careful review of the testimony in this case we must concur with the trial judge that not only was there a complete absence of evidence showing actual damages resulting from Smith's assault, but there was also affirmative evidence to the contrary. It was Mr. Green himself who described his own state of mind. He testified that when Smith pointed the gun at him: "I never let loose. I said it would be the last person he ever killed." Moreover, during cross-examination Green testified "I wasn't scared of the gun then. He could of killed me and it still wouldn't have scared me." Finding no error in these instructions on damages we must affirm this aspect of the judgment as to Smith.

## THE TRESPASS INSTRUCTIONS

The major thrust of the Greens' appeal focuses on the

court's instructions on trespass to real property by the Washington Suburban Sanitary Commission and the Marbro Company. The appellants complain of the court's failure to instruct the jury that "the prescriptive easement known as Bethesda Church Road was limited to that portion of plaintiffs' property actually used as a roadway for the prescribed period of time." Such an instruction he claims would have properly confined the prescriptive right-of-way to the 15-18 foot concrete portion of the roadway. The court on the other hand instructed the jury:

> "The Sanitary Commission claims this 40-foot wide right of way was a public easement by prescription; that is, because the public had used it continuously for more than twenty years prior to May 1, 1967.
>
> "In determining whether or not there was a forty-foot wide right of way on May 1, 1967, you may consider any evidence of public travel and/or maintenance by a public agency of this road."

The appellants do not question the abstract legal proposition contained in this charge but only contend that the evidence presented at trial made it inapplicable to the case. They seem to suggest that the only permissible inference to be drawn from the testimony was that road maintenance and pedestrian traffic beyond the concrete surface of the road were occasional aberrations and merely incidental to the main use of the road. Therefore, they contend, these activities did not amount to the continuous adverse possession necessary to establish a prescriptive right-of-way.

In this case we conclude that there was ample evidence of travel and maintenance to justify the trial court's instruction. There is no specific minimum use requirement needed to establish a public right-of-way by prescription, although slight or occasional use of unenclosed land is not sufficient. *Feldstein v. Segall*, 198 Md. 285, 295, 81 A. 2d 610 (1951); Elliott, *Roads and Streets*, § 194 (4th

ed. 1926). In the recent case of *Garrett v. Gray,* 258 Md. 363, 376, 266 A. 2d 21 (1970) we found that acquiescence in minimal public travel from 1914 to 1961 sufficed to convert a farm road into a public way. There we said at page 378:

> "True, the traffic may have been sparse; none-theless, members of the public freely passed over it without seeking permission of the owners through whose property the road passed, and it was a continued and uninterrupted use by persons other than the property owners whose property is traversed by the road."

In *Feldstein v. Segall, supra,* we concluded that "a widened right-of-way no less than a new one, may be acquired by prescription." Mr. Green testified that since 1926 people have walked where the Sanitary Commission placed the ditch. In addition Russell W. Day, a highway maintenance supervisor, testified that he had worked for the State Roads Commission for thirty-seven years and that he personally had participated over this period in the maintenance of the hard surface and the dirt shoulders of Bethesda Church Road, which included that area where the trench had been dug. These statements answer appellants' assertion that no witness testified the adverse use here continued for the twenty year prescriptive period.

The appellants assert that the trial court erred in giving an instruction based on our holding in *Turner v. Washington Sanitary Comm.* 221 Md. 494, 158 A. 2d 125 (1960). In that case we held that in a developing suburban area the right-of-way for a public highway extends not only horizontally over the surface of the land for the purpose of travel but also vertically below the surface of the roadbed for the purpose of laying sewer and water lines.[1]

---

1. See § 71-50 of the Montgomery County Code (1965) amended in Chapter 725 of the Laws of 1969 for the authority of the Sanitary Commission "to enter upon any . . . public highway, for the

The only grounds they offer to demonstrate the inapplicability of this holding to their case is that in *Turner* the easement had been acquired by a conveyance which clearly set out the lateral boundaries of the right-of-way. Their argument is that because the State acquired the right-of-way here by prescription and then only with great debate over the exact boundary lines, any instruction based on. *Turner* was irrelevant, misleading and, worst of all, assumed the ultimate fact to be resolved by the jury. Conceivably the methods of aquiring title can affect the rights in the property obtained but we completely fail to see how the acquisition of this right-of-way by prescription could change the impact of the rule in *Turner*. Moreover, we believe that when Judge Mathias submitted the issues concerning the width of the right-of-way to the jury, his instructions were clear, elaborate, and unequivocal. They immediately preceded his discussion of the holding in *Turner* and made it obvious to the jury that as a prerequisite to finding this was a suburban road in which the Sanitary Commission had a right to lay its sewer lines they first had to decide that the pipes had in fact been laid within the State's prescriptive right-of-way.

The questions of liability for the initial and continuing trespass q.c.f. were submitted to the jury without error. The finding of no liability obviates the need for us to discuss the appellants' questions concerning punitive damages against the Sanitary Commission or the questions appellees have raised concerning sovereign immunity.

## THE CONSPIRACY COUNTS

The Greens' last redoubt is in their hope that we will somehow find error with the trial judge for directing the verdict against them on the six counts reciting conspiracies to commit assault and battery, false imprisonment,

---

purpose of installing . . . sewerage and drainage systems . . ." without permit or payment of a charge to the public authority having control of the highway in question. This is also codified in the Prince George's County Code of Public Local Laws (1963) § 83-100.

malicious prosecution, and several trespasses. We do not think that the law of civil conspiracy or the facts of this case will accommodate them.

A civil conspiracy is a combination of two or more persons by an agreement or understanding to accomplish an unlawful act or to use unlawful means to accomplish an act not in itself illegal, with the further requirement that the act or the means employed must result in damages to the plaintiff. *Bachrach v. United Cooperative*, 181 Md. 315, 29 A. 2d 822 (1943); *Kimball v. Harman*, 34 Md. 407 (1871). The appellants' basic contention is that the unlawful objective of this conspiracy was to dispossess them of their property. The short answer to this is that the jury found that neither the Sanitary Commission nor the other defendants unlawfully entered upon or interfered with the Greens' property. If, as the jury determined, the act of taking possession of the property in order to lay the pipe was lawful, it obviously follows that a confederation or combination to perform this act could not have been unlawful either. A similar result follows from the jury determination that no defendant was guilty of false imprisonment or malicious prosecution. *Bachrach v. United Cooperative, supra.* However, as we have indicated, there can be a conspiracy to utilize unlawful means to achieve an otherwise legal objective. Was there a conspiracy, then, in regard to the assault charges, the two offenses the jury determined were unlawfully committed during the course of clearing the barricade? Viewing the testimony in a light most favorable to the plaintiffs, we fail to see any evidence from which the jury could have concluded that either of these offenses came about as a result of an agreement or combination. On the contrary, all indications are that these acts of violence were individual and spontaneous eruptions which occurred primarily in response to Mr. Green's own conduct.

*Judgments affirmed. Costs to*
*be paid by the appellants.*