*Bay City Property Owners Association, Inc. v. County Commissioners of Queen Anne's County, et al.*
No. 0034, Sept. Term, 2023
Opinion by Leahy, J.

**Adverse Possession > Nature and Requisites > Duration and Continuity of Possession > Continuity in general**

The requirement that adverse use be uninterrupted or continuous also does not mean that the use "must be exercised constantly and without any intermission"; rather, the requirement "may be satisfied by use 'with such frequency and constancy as to affect the landowner with notice that it is being exercised[.]'" *Zimmerman v. Summers*, 24 Md. App. 100, 108 (1975) (quoting 4 Tiffany Real Prop. § 1202 (3d ed.)).

**Easements > Creation, Existence, and Termination > Evidence > Presumptions and burden of proof**

In a quiet title action, the plaintiff initially bears the burden of proving possession and legal title to contested property. *Wilkinson v. Bd. of Cnty. Comm'rs of St. Mary's Cnty.*, 255 Md. App. 213, 259 (2022). If the party seeking to quiet title establishes possession and legal title, and the opposing party raises the affirmative defense of adverse possession, then the burden shifts to the proponent of the adverse use "to show that it has had the character and is of the duration required by the law." *Dalton v. Real Estate & Improvement Co. of Balt. City*, 201 Md. 34, 41 (1952) (citing *Cox v. Forrest*, 60 Md. 74, 79 (1883)). Because the "use of a way over the lands of another whenever one sees fit, and without asking leave, is an *adverse* use," once such adverse use has been established, the responsibility shifts back to "the owner of the land, to show that the use of the way was by license or contract inconsistent with a claim of right." *Clickner v. Magothy River Ass'n Inc.*, 424 Md. 253, 280-81 (2012) (quoting *Cox*, 60 Md. at 79-80).

**Easements > Creation, Existence, and Termination > Evidence > Presumptions and burden of proof**

When a non-owner "has used a right of way for twenty years unexplained, it is fair to presume that the use has been under a claim of right, unless it appears to have been by permission." *Garrett v. Gray*, 258 Md. 363, 375 (1970) (quoting *Smith v. Shiebeck*, 180 Md. 412, 419 (1942)). The claim of right requirement "appears ordinarily to be satisfied by acts and circumstances of a character which serve to show that the use[] is adverse; as, for example, by exercising jurisdiction over the road, working it, or expending money in repairing it." 4 Tiffany Real Prop. § 1214 (3d ed.).

**Easements > Creation, Existence, and Termination > Prescription > Adverse Character of Use > Use by permission or agreement**

"Mere failure to protest is not permission but acquiescence[,]" which is "the inactive status of quiescence or unqualified submission to the hostile claim of another[.]" *Dalton*, 201 Md. at 50 (quoting *Alstad v. Boyer*, 228 Minn. 307, 37 N.W.2d 376 (1949)).

**Easements > Creation, Existence, and Termination > Prescription > Adverse Character of Use > Use by permission or agreement**

Because Bay City did nothing to assert its own dominion or control over the Intersection, its failure to stop the County from using taxpayer funds to maintain the Intersection was acquiescence; in other words, it was an "unqualified submission to the hostile claim of another, [] not to be confused with permission, which denotes a grant of permission in fact or a license." *Garrett v. Gray*, 258 Md. 363, 377-78 (1970).

**Eminent Domain > Nature, Extent, and Delegation of Power > Public or Private Use in General > In general**

The standard for a public easement obviously does not require that one person or group show exclusive use over the twenty-year period. Instead, as the Supreme Court of Maryland has instructed, "[p]ublic use requires that all persons must have an equal right to the use and that it must be in common, upon the same terms, however few the number who avail themselves of it. . . . as it is the right of public travel and not the exercise of the right which constitutes a road a public highway." *Garrett v. Gray*, 258 Md. 363, 378 (1970) (quoting *Dep't of Pub. Works & Bldgs. v. Farina*, 29 Ill.2d 474, 194 N.E.2d 209 (1963)) (internal citations omitted).

**Highways > In General; Establishment > Establishment by Prescription, User, or Recognition > In general**

Maryland courts have long held that it is possible to establish the existence of a public way by "evidence of an uninterrupted use[] by the public for twenty years" because of "the presumption [] that such long continued use and enjoyment by the public of such way had a legal rather than an illegal origin." *Mt. Sinai Nursing Home, Inc. v. Pleasant Manor Corp.*, 254 Md. 1, 6 (1969) (quoting *Thomas v. Ford*, 63 Md. 346, 351-52 (1885)). Such use "serves to give the owner notice" that in order to "dispute the rightfulness of the public use, the owner must assert his or her right within a statutory period by physical action or suit." 10A McQuillin Mun. Corp. § 30:23 (3d ed.). After such public use for that period, "a perfect title by prescription . . . vests in the public." *Mt. Sinai Nursing Home, Inc.*, 254 Md. at 5 (citation omitted).

**Highways > In General; Establishment > Establishment by Prescription, User, or Recognition > Evidence as to existence of highway**

Here, the trial court's finding that the Intersection has been in continuous public use for at least twenty years was fully supported by the testimony of several witnesses that they, and other members of the public, travelled freely through the Intersection without having to request permission, and by the testimony and exhibits demonstrating that the County had improved and maintained the Intersection since 1995.

Circuit Court for Queen Anne's County
Case No. C-17-CV-22-000042

REPORTED

IN THE APPELLATE COURT

OF MARYLAND

No. 0034

September Term, 2023
_____

BAY CITY PROPERTY OWNERS
ASSOCIATION, INC.

v.

COUNTY COMMISSIONERS OF QUEEN
ANNE'S COUNTY, ET AL.
_____

Leahy,
Albright,
Harrell, Glenn T., Jr.
        (Senior Judge, Specially Assigned),

JJ.
_____

Opinion by Leahy, J.
_____

Filed: October 2, 2024

Pursuant to the Maryland Uniform Electronic Legal
Materials Act (§§ 10-1601 et seq. of the State
Government Article) this document is authentic.



Gregory Hilton, Clerk

This controversy arises from neighborhood opposition to a planned subdivision in Queen Anne's County (the "County").[1]  The developer, Land Bridge, LLC, seeks approval to build 'Placek's Place,' comprising ten homes, on a parcel adjacent to a large existing residential community known as Bay City.  The parcel borders the L-shaped intersection of Stafford Road and Victoria Drive.  Stafford Road is a private road maintained by Bay City Property Owners Association, Inc. ("Bay City" or "Appellant"), and Victoria Drive is a public road maintained by the County.  The County approved Land Bridge's plan to connect the access road to Placek's Place at the termination of Victoria Road in the L-shaped intersection.

After learning of the proposed development, Bay City took the position that Stafford Road subsumes the entire L-shaped intersection, terminating Victoria Drive fifty feet short of the proposed Placek's Place development.  In February 2022, Bay City brought an action in the Circuit Court for Queen Anne's County seeking a declaration that the entire intersection was part of the private road maintained by Bay City and to quiet title.  The circuit court found in favor of Land Bridge, LLC ("Land Bridge"),[2] and the County ("Appellees" or "defendants" below).

---

[1] In the underlying lawsuit, the defendants were the County Commissioners of Queen Anne's County and Land Bridge, LLC.  We have replaced references to the "Board of Commissioners" with "the County."

[2] We refer to Land Bridge, LLC, and Lacrosse Homes t/a Land Bridge, LLC, as "Land Bridge."

Bay City noted this timely appeal and presented three issues,[3] which we condense into two:

1.  Whether the circuit court erred in deciding that the disputed section of road is a public road by prescription.

2.  Whether the circuit court erred in finding that Bay City's claims for declaratory relief and to quiet title are barred by the doctrine of laches.

We hold that the trial court correctly declared that a public easement has been established over and through the L-shaped intersection of Victoria Drive and Stafford Road (the "Intersection"). The court's finding that the Intersection has been in continuous public use for at least twenty years is fully supported by the testimony of several witnesses that they, and other members of the public, travelled freely through the Intersection without having to request permission, and by the testimony and exhibits demonstrating that the County has improved and maintained the Intersection since 1995. Therefore, we affirm the circuit court's judgment that the Intersection is a public road by prescription without reaching the court's alternative determination based on the doctrine of laches.

---

[3]   The issues presented by Appellant, as written, are:

1.  Whether the Circuit Court erred in deciding that the disputed section of road is a public road by prescription?

2.  Whether the Circuit Court impermissibly shifted the burden of proof in this case to Bay City?

3.  Whether the Circuit Court erred in finding that Bay City's claims for declaratory relief and to quiet title are barred by the doctrine of laches?

2

**BACKGROUND**

Bay City is the dues-collecting homeowner's association for the Bay City community located on Kent Island in Stevensville, Maryland. The community comprises over 750 homes, a private playground, and a private park with boat launch. When Bay City was created in the 1950s, all of the roads within the Bay City community were privately owned by Bay City under a set of covenants that specify various rights and responsibilities over the common areas within the community. The land conveyed through the covenants is "subject to an easement in favor of the owners and occupants of lots and houses bordering other parts of the . . . road or roads." The covenants provide that Bay City is responsible for maintaining the private roadways within the community, and Bay City collects annual assessments from Bay City residents to maintain all the private amenities, including the private roads. As authorized by the covenants, Bay City dedicated several of the private roads within the community, or portions thereof, to Queen Anne's County by written and recorded conveyances in 1967, 1975, and 1987.

*County Investment in the 1990s*

When the County brought public water and sewer service to the Bay City community in the mid-1990s, Bay City agreed to have several roads improved to meet public-road standards and to transfer the responsibility for maintaining those roads to the County. Although the County held public hearings on the proposal to upgrade the roads in Bay City and imposed a special tax assessment for improvements, the parties agree that there are no recorded deeds or plats reflecting the dedication of the roads that were transferred to the County. The parties also agree that the transfer included the stretch of

3

Victoria Drive at issue in this case[4]—they disagree, however, on where Victoria Drive ends.[5]  As summarized in the circuit court's underlying opinion, Bay City alleges that it intended "for the County to stop any improvements to Victoria Drive before the Intersection with Stafford Road, with the entire [I]ntersection left unimproved and under the control of Bay City."

Victoria Drive runs 0.18 miles south from its intersection with Bay City Road, a main artery into the Bay City community, and terminates in the Intersection with Stafford Drive.  The right of way for both Victoria Road and Stafford Drive is 50 feet in width, of which 20 feet in width is paved.  The diagram below, taken from County Exhibit 2A introduced at trial, shows the Intersection, and, at the south side of the Intersection, the approximate location of the driveway to parcel 390 with an address of 721 Victoria Drive.[6]

---

[4] Earlier sections of Victoria Drive were transferred to the County by written and recorded dedications—those are not implicated in the present dispute.

[5] Bay City's witness, Michael John Dreisedel, President of Bay City Property Owner's Association, testified that "[t]he portion of Victoria Drive from Bay City Road to where it stops at Stafford is a county road."

[6] To better orient the reader, we have modified County Exhibit 2A to identify: 1) the parcel of land purchased by Land Bridge from the Living Water Lutheran Church (the "church property"); 2) the half-acre lot abutting the church property on its eastern boundary, purchased from the Placeks (the "Placek parcel"); 3) Route 8; 4) the approximate location of the fire hydrant installed by Queen Anne's County (marked with an X); and, 5) an arrow pointing North.



*Placek's Place Planning*

On February 10, 2014, Land Bridge, through its predecessors in title, contracted to purchase a parcel of land from the Living Water Lutheran Church (the "church property") to be the site of Placek's Place development. The church property is landlocked except for a northern frontage along Stafford Road terminating just shy of the Intersection and an easement over private property extending to Route 8.

On February 5, 2015, Land Bridge also contracted to buy a half-acre lot abutting the church property on its eastern boundary (the "Placek parcel") from Paul and Rebecca Placek. The northern frontage of the Placek parcel spans the Intersection, and from there,

5

the boundary extends east along a residential lot line and terminates at Route 8. Together, the Placek parcel and the church property comprise the proposed Placek's Place development, which has a direct point of access from the Intersection that is 50 feet wide.

Bay City meeting minutes reflect discussions pertaining to road access for a potential development on the church property during at least two property-owners' meetings, in September and November of 2016.[7] Living Waters Lutheran Church inquired with the County's Department of Public Works ("DPW") whether it would grant access or permission to extend Victoria Drive and provide access to property owned by the church. Todd Mohn, then director of DPW, responded that "access to extend" Victoria Drive, "the county road," could not be granted to the church. He noted, however, that the Placek parcel, adjacent to the church property, appeared "to have adequate frontage along Victoria Drive[.]"

In November 2016, the County's Planning Director asked the planning attorney, Christopher Drummond, Esq., whether the owner of the Placek parcel "may access the property through the public road system in the Bay City community." Mr. Drummond responded that "Victoria Drive . . . is maintained by the County[,]" "is open to the public[,]" and "is not dedicated to the use of Bay City residents only." He determined that "Victoria Drive dead ends at the Placek [parcel] at a width of 50'[,]" and so "common sense suggests that [the Placek parcel] has 50' of frontage on Victoria Drive."

---

[7] Bay City meeting minutes from September 6, 2016, refer to "issues related to [Land Bridge] and Victoria Drive Access Road Questions[,]" and the minutes from November 3, 2016, refer to the "Church Queen Anne's County Road Access Dispute."

6

In July 2017, the County's Department of Planning and Zoning ("DPZ") issued conditional approval of the Placek's Place subdivision plan, including comments from DPW:

> Both field evidence and historical County Road inventory records indicate that Victoria Drive extends to the Placek property and Stafford Road begins on the northwestern side of Victoria Drive. Based on this, it is the County's position that the property fronts on Victoria Road and can be granted access by the County Roads Division.
>
> Either [Bay City] or the developer may need to seek a declaratory judgment to clarify the status of Stafford Road and the public's right to use of same and/or the location of the demarcation line between Stafford Road and Victoria Drive.

Land Bridge closed on the contracts for sale and acquired the deed to the Placek parcel in 2019, and the deed to the church property on November 6, 2020. In early 2021, Land Bridge submitted Placek's Place to the DPZ for preliminary subdivision approval, showing access from the Placek parcel's frontage on the Intersection. Representatives from Land Bridge, along with the County's Principal Planner, Rob Gunter, presented the Placek's Place project at the September 2021 public meeting of the County Planning Commission ("Commission"). Representatives from Bay City opposed the project, contesting the County's ownership of the Intersection on the ground that Victoria Drive terminates before the Intersection. The Commission granted preliminary approval of the project at the meeting, and then finalized its approval at the next meeting on October 14, 2021.

7

On February 16, 2022, Bay City filed the subject action in the Circuit Court for Queen Anne's County for declaratory judgment under Maryland Code (1974, 2020 Repl. Vol.), Courts and Judicial Proceedings Article ("CJP"), § 3-409, and for quiet title against the County and Land Bridge. The defendants each filed answers in which they asserted laches and other affirmative defenses. The County asserted that it had "considered the section of Victoria Drive in question as a part of the County road system since 1995, [and] ha[d] collected Highway User Revenue for the same and ha[d] maintained the road as a part of its road system, including the intersection of Stafford Road and Victoria Drive." All parties engaged in discovery, and on September 30, 2022, Land Bridge moved for summary judgment. The motion was denied on October 17 and the parties went to trial.

*The Trial*

The action was tried by the court on February 2, 2023. The first witness, Michael John Dreisedel, President of the Bay City Property Owner's Association, testified that "[t]he portion of Victoria Drive from Bay City Road to where it stops at Stafford is a county road." Mr. Dreisedel admitted that the County maintains Victoria Drive and typically removed snow through the Intersection, testifying that "[i]t would be unrealistic for snow removal for a truck to go and stop before Stafford with a pile of snow in front of it and not push it all the way through Stafford because it would landlock that resident." He claimed that when the County resurfaced the Intersection with asphalt between 2014 and 2017, the County overlapped the tar and chip paving that Bay City used in resurfacing Stafford Road in 2014.

John Joseph ("Jay") Sullivan, a Bay City board member, testified that he had owned the property located "at the end of Victoria Drive and the corner of Stafford Road" since 2019. He said that when he moved in, use of "this section of Stafford Road" by Amazon trucks making deliveries was "common[,]" but he did not recall seeing school buses or utility trucks. He explained that when going to his house, he enters through Bay City Road and turns onto Victoria Drive.

Mr. Sullivan recounted that at one point the Intersection itself had become overgrown such that it was only "passable to walk or maybe [by] a small car" and that he and other residents had trimmed trees and cut back brush on behalf of Bay City to "clear the opening out to where it is now passable by normal vehicles." He added that there is "nothing in . . . [the] community anywhere that's open to the public" and, as such, "[t]here's no reason to be in this area of the neighborhood."

On cross-examination, defense counsel asked Mr. Sullivan if Bay City had posted any signs that restricted the use of the roadway, and he replied, "I think we do have Bay City residents and guests only signs up at our entrances" and "on our facilities[.]" Mr. Sullivan could not produce documentation of any signage at trial, however, because "nobody talked to [him] about signs[.]"

Bay City also called as a witness Ronald Shane Moore, DPW's Chief Roads Engineer, who testified that the County used a "special tax assessment process" in 1995 to add Victoria Drive and other Bay City roads to its inventory. Mr. Moore related that on

9

April 19, 1995, before his tenure began,[8] the Queen Anne's County Commissioners held a public meeting of the roads board in which they identified specific roads within Bay City to be upgraded to public standards and thereafter maintained by the County, and that "the majority of what was left was private." Because Mr. Moore was not present at that meeting, he described only the customary process for dedication:

> There's typically an information meeting with that particular road, the residents of that road spearheaded by the people that live on the road that want to upgrade it. Based on the support from the residents—commissioners are invited to those meetings, as well, but they don't always attend, but based on that we'll go to the commissioners and we'll ask for a hearing and we'll usually them [*sic*], you know, 10 people showed up, four against, one not, you know, that kind of thing. Then based on that we'll actually have a public hearing; that's advertised in the newspaper, certified letters. The roads board chairs the hearing, they listen to the testimony. We provide two weeks of open record and then after that, the commissioners review all that data at their normal meeting and decide whether or not to move forward with the project.

Mr. Moore said that he had not come across County records specifying "a discussion between the County or representatives of the County and members of [Bay City] regarding this particular intersection or Victoria Drive being transferred to the County[.]" However, he explained that the proposal to upgrade specific roads to county roads was approved at the regular commissioner meeting on May 2, 1995, and "from that moment on is when the County consider[ed] [the Intersection] their road[.]" Mr. Moore clarified that while the County "added that section [of Victoria Drive] into our inventory [in] December of 1995[,]" the County would have only performed minimal maintenance work at that time "because the idea is that the actual improvements are paid for by the residents, as part

---

[8] Mr. Moore began to work for the County in 2000, in the "roads department"; he became Chief Roads Engineer in 2003.

of . . . a private to public road improvement project[,]" and that "once that's completed and paid for by the residents, then we begin normal maintenance activities that we would log as going out and fixing potholes or driveway pipes, things like that." However, he confirmed that "once the commissioners make their decision, we consider it our road and we will respond to citizens calling and saying they need assistance with something on the roadway."

Although he had reviewed county records with the road superintendent and did not find a record of tar and chip paving of Victoria Drive before 2015, Mr. Moore explained that he and the superintendent both believed that it "most likely happened" at some point. "For some reason it's just not in the files. For tar and chip to last from the late '90s all the way until 2015 is pretty—it would be pretty amazing tar and chip to last that long." He noted that the slurry seal that the County applied in 2015 is a product used as a sealer, "[s]o the road itself has to [already] be in pretty good shape."

Mr. Moore authenticated the 1995 Roads Inventory Report from the County to the State of Maryland, which reflects the **addition of Victoria Drive "from Stafford Road to Bay City Road" as a distance of 0.18 miles.** (Emphasis added). He stated that the distance of 0.18 miles equated to the distance of 910 linear feet "used in the public hearing for the cost estimate[.]" He noted that in addition to the corroborating evidence of "the 910 feet" there is the evidence that "721 Victoria Drive[,]" the home whose driveway springs directly from the curve of the Intersection, was "included as part of the assessment of the . . . original project" to upgrade the road. He further explained that every year the County submits the roads inventory report to the State, and that the "Maryland State

11

Highway takes that information . . . create[s] maps . . . using GPS . . . [which is] part of the highway user revenue system to calculate how much money the County gets . . . and how [the County] use[s] revenue designated to every municipality in the [S]tate."

Mr. Moore identified a 2002 map from the State Highway Inventory Report, which the Queen Anne County DPW received every year, showing "roads that were included" as County roads and assigned a "county route number." He observed that on the map from 2002, Victoria Drive was demarcated as a county road and assigned a county route number. He noted an arrow on the map pointing to the Intersection, which indicated "the terminus." Mr. Moore was asked, looking at the map, "Does the County consider the [I]ntersection as part of the county road, that part of Victoria Drive?" Mr. Moore responded, "Yes." Importantly, Mr. Moore was able to identify on a street-level photograph a fire hydrant, installed by the County's "sanitary division," located on the south side of Stafford Road just before it joins the Intersection.

Mr. Moore said he disagreed with Mr. Sullivan's testimony that "there were signs restricting the use of roads to Bay City residents," saying "I have never seen a sign restricting anything." Mr. Moore testified that Bay City Road and Victoria Drive are public roads, and "[a]nyone can drive down there" including "[d]elivery trucks, postmen, school buses, guests, . . . [s]ightseers, anybody around."

*Land Bridge's Case*

Lindsay Dixon, managing member of Land Bridge, testified that he had been to the Intersection "[m]any times" and was not aware of any signage at the Intersection limiting access by "people from outside the community[,]" nor had he ever been told that he

12

"shouldn't have been back there" because he was not "a resident or invitee" of Bay City. Mr. Dixon reviewed a photograph of the Intersection that was entered into evidence and observed a "[d]istinct line between Stafford and Victoria on the quality and width of the road." He also noted that there was a fire hydrant "maybe a hair on the Stafford side."

Mr. Dixon described the history of the Placek's Place project. He said that after contracting for the church property, he "reached out to the County for clarification." He "received a letter from public works stating that Victoria would be the access and that we'd have to acquire [the Placek parcel] to gain access." As the result of this communication, he "went to Mr. Placek and worked out a contract with him in 2015 to acquire [the Placek parcel] to gain access to Victoria."

Mr. Dixon acknowledged that he had entered into multiple contracts on both properties, with closing contingent on subdivision approval, and that Land Bridge "had the ability to choose not to go forward, not to close under the contract, if any of [its] contingency concerns were not satisfied[.]" He admitted that he closed on the contracts before he received approval on the subdivision, relying instead upon "two letters, from a county attorney and from public works saying that [Land Bridge] had access from Victoria Road[,]" as well as his consultant engineer's survey.[9]

He acknowledged that the church property had an easement that was 15 feet wide "through the parking lot of the American Legion" and a wetlands area, connecting the

_____

[9] Mr. Dixon testified that, by that point in time, Land Bridge paid "[a]round $200,000" for the church property and over $350,000 for the Placek parcel and had invested "pushing $900,000" in Placek's Place in total.

13

property to Route 8, but asserted that the easement could not be used to construct the ingress and egress to a residential subdivision. If Land Bridge were denied access to Victoria Drive, he said, it would "have to go back through the process and try to work with the County and State Highway to figure out some form of access onto Route 8[,]" at "significant" additional cost.

Mr. Dixon acknowledged comments from DPZ on the Placek's Place plan review stating that "[e]ither the Bay City—the BCPOA [Bay City Property Owners Association] or the developer may need to seek declaratory judgment to clarify . . . the line between Stafford and Victoria." He also authenticated an email that he wrote to a representative of Living Waters Lutheran Church in June 2017, stating:

> We are still held up by local politics on the Placek subdivision. The County attorney has asked to go to the courts for a declaratory judgment, an opinion, on the title access to Placek. We feel that this is crazy and we are unwilling to waste time and money on something we've already received the County's position on from public works.

According to Mr. Dixon, Land Bridge could not have sought a declaratory judgment for itself, because the dispute over the possession of the land was between "Bay City[] and the County."

Mr. Dixon authenticated a survey conducted by Lane Engineering for the Placek Place subdivision. On the survey, Mr. Dixon identified the Intersection and where there was a change in the pavement. He observed that the survey "even shows the hydrant." The survey was marked as "Defense Exhibit 1" and entered into evidence. The survey shows the fire hydrant on the south side of Stafford Road just west of the Intersection.

14

*Memorandum Opinion and Order*

In a Memorandum Opinion and Order entered on February 7, 2023, the trial court declared "that the [I]ntersection of Victoria Drive and Stafford Road, Stevensville, MD 21666 is [] part of Victoria Drive," and "that Victoria Drive is a public road, under the ownership and control of Queen Anne's County, Maryland."

The judge found that since the mid-1990's, "the County initiated a project to install public water and sewer infrastructure" in Bay City. Bay City "agreed to have several roads improved, including Victoria Drive" after the County installed "the public utilities." Although Bay City claimed that it "intended for the County to stop any improvements to Victoria Drive before the Intersection[,]" the judge observed that the County had nevertheless "performed maintenance and snow removal throughout the entirety of the Intersection . . . since 1995[,]" and that Bay City had "never objected to these maintenance efforts by the County." Moreover, the judge found that the County's repaving of Victoria Drive in 2015 "extended throughout the Intersection and around the corner onto Stafford Road[,]" and was done with Bay City's acquiescence. Further, the judge observed that "the entire Intersection has continuously been traversed by members of the public as well as residents of Bay City," and that Bay City has never restricted public use with "barricades, restrictions, or signage[.]" Although the court acknowledged that Bay City "did have a survey conducted which identified the Intersection as part of Stafford Road" in 2017, "neither the County nor Land Bridge was made aware of this survey and were given no other indications that Bay City believed the [I]ntersection is part of Stafford Road." She observed that "[u]ntil the filing of the Complaint in this action, Bay City made

15

no efforts to assert control over the Intersection." Finally, the judge quoted from the Placek's Place plan review comments issued by DPZ in July 2017, including:

> Both field evidence and historical County Road inventory records indicate that Victoria Drive extends to the Placek property and Stafford Road begins on the northwestern side of Victoria Drive. Based on this[,] [i]t is the County's position that the property fronts on Victoria Road and can be granted access by the County Roads Division.

In her analysis, the judge compared the action to the Maryland Supreme Court case, *Garrett v. Gray*, 258 Md. 363 (1970), which concerned "the rights of appellants to the use of a twelve-foot-wide dirt road running a short distance between two public roads" that "[m]embers of the public had used . . . for over twenty years." She observed that here, as in *Garrett*, "the traffic may have been sparse; nonetheless, members of the public freely passed over [the road] *without seeking permission* of the owners through whose property the road passed, and it was a continued and uninterrupted use by persons other than the property owners whose property is traversed by the road." (Quoting *Garrett*, 258 Md. at 378) (emphasis supplied by the trial court).

The court iterated facts tending to show Bay City's acquiescence to the public's use of right of the Intersection:

> Here, no members of the public have ever asked permission or felt the need to ask permission to use the Intersection, as no barricades, signs, or other restrictions have ever been placed by Bay City to indicate that the intersection was part of the private Stafford Road and not part of Victoria Drive. Despite testimony by Plaintiff's witness Jay Sullivan that he believed there to be some signage at the entrance of the Bay City Community, no signage has ever been placed at the Intersection indicating any restriction on its use. Due to the maintenance, snow plowing, and repaving of the intersection by the County, the Intersection has every appearance of being the natural end of Victoria Drive, not a part of Stafford Road. In fact there is no signage posted at the Intersection at all, including any signs indicating

16

the name "Stafford Road."

Although she agreed with Bay City's assertion that "that the public use here has been even more sparse than the use in *Garrett*," the judge countered:

> This may be true, but the use has been public, continuous, and uninterrupted all the same. Importantly, in addition to that public use, Bay City has permitted the County, with taxpayer funding, to run public utilities upon and beneath both Victoria Drive and Stafford Road, to maintain those utilities, to perform snow plowing and other maintenance, and to repave the entirety of the Intersection.

The judge concluded that the Intersection was part of Victoria Drive, and had become "a public road, under the ownership and control" of the County. Turning to Bay City's delay in initiating the declaratory judgment action, she found that Bay City had waited five and a half years from the time Bay City had knowledge of the road dispute to file the complaint, and concluded that "if Bay City believed it had control over the Intersection while knowing that both the County and Land Bridge believed the opposite, any claim for relief became barred by the doctrine of laches several years ago."

## DISCUSSION

### I.

### Acquisition of Land and Burden of Proof

### Parties' Contentions[10]

Bay City challenges the circuit court's declaration that the public acquired the

---

[10] Bay City also contests the trial court's alternate ruling that its claim for relief was barred by the doctrine of laches. As previously noted, because we affirm the trial court's declaration that the public acquired the Intersection by prescription, we need not address the trial court's alternate ruling.

Intersection by prescription. Bay City asserts that the court erred by assigning to it the burden to prove that there had been no acquisition by prescription, and that Appellees had failed to establish public use of the disputed area that was continuous and adverse. According to Bay City, the court relied only on negative factors, such as the non-barricading of the road, and thereby imposed an impermissible shift of the burden of proving adverse use onto the party seeking to quiet title.

Bay City also disputes the factual findings that underpin the court's legal conclusion that the Intersection is public and a part of Victoria Drive. First, Bay City claims the trial court was erroneous in its finding that "the entire [I]ntersection has continuously been traversed by members of the public as well as residents of Bay City." In fact, Bay City contends, Appellees failed to produce "any testimony or other evidence demonstrating uninterrupted use of the disputed section of road by any member of the public for twenty years or more[.]" Resting on Mr. Sullivan's testimony, Bay City argues that for "some portion of time during the alleged prescriptive period[,]" a portion of Victoria Drive was in disrepair and "largely impassable[,]" which resulted in Victoria Drive functioning as "a dead end at the disputed [I]ntersection."

Second, Bay City challenges the court's factual finding that "the County has performed maintenance and snow removal throughout the entirety of the [I]ntersection and around the corner for a number of feet after the turn onto Stafford Road since 1995[.]" It notes that the County "ha[d] no records" confirming that it resurfaced or repaired potholes on Victoria Drive prior to the County resurfacing the Intersection with slurry seal in 2015. Bay City assigns error to the trial court's declaration that the Intersection is a "road by

18

prescription" because there was a "complete lack of any testimony or other evidence demonstrating uninterrupted use[.]"

Bay City contends that the court also erred in determining that public use of the Intersection had been adverse because Bay City had not placed any signs restricting public access. Bay City points out that the court found that it "**permitted** the County . . . to run public utilities" upon and beneath Victoria Drive. (Emphasis supplied by Bay City). Therefore, says Bay City, the court should have recognized that such permission *defeated* any claim of adverse use. (Citation omitted).

Appellees, as expected, contend the trial court was correct in its determination that the Intersection has become a public road by prescription, and Appellees compare the case at bar to *Garrett v. Gray*, as an example of "a public way predicated on the uninterrupted use by the public for over twenty years." (Quoting *Garrett*, 258 Md. at 370). They maintain that the court properly assigned the burdens of proof in this quiet title action. While they acknowledge that "a party asserting prescriptive rights bears the burden of proving use of the land in question," they rely on *Garrett* for the principle that once a party demonstrates adverse access, "the burden is upon the owner of the land to show that the use of [the land] was by license or contract inconsistent with a claim of right." (Quoting *Garrett*, 258 Md. at 375). Appellees urge that once they met their burden to show continuous public use, the burden shifted back to Bay City to prove that the use had been permissive.

Appellees counter Bay City's contention that they failed to provide an adequate factual basis upon which the court was able to determine that the Intersection was used

continuously for more than twenty years. They point out, for example, that both Mr. Moore and Mr. Dixon testified that they repeatedly travelled through the Intersection over many years, and that Bay City's own witness, Mr. Sullivan, testified that traffic by retail delivery trucks was common. They note that their witnesses testified that no signage prohibiting public access was posted on Victoria Drive, and emphasize that the court indicated in its memorandum opinion that it did not find credible the contradictory testimony from Mr. Sullivan. Appellees highlight the County roads engineer's testimony that "all of Victoria including the [I]ntersection had been a public road since 1995 and that 'anyone' could drive down the road including delivery trucks, postman, school, buses, guests and sightseers."

While Appellees acknowledge that they did not present numerous witnesses to testify to their personal use of the roadway, as in *Garrett*, they direct our attention to the Supreme Court's instruction in that case, that "the extent to which the public actually used the road was of less import than the right to use it." (Citing *Garrett* 258 Md. at 378). Here, the public use is supported by the County's maintenance and the Intersection "is located in a community comprised of approximately 780 homes with two different access points."

Appellees describe Bay City's statement that the Intersection "cannot be accessed from any public road located outside the development" as misleading, because in fact, the disputed section of road is accessed by turning off Maryland Route 8, a State Road, onto Bay City Road, a County Road, and then making a quick left onto Victoria, another County Road. They assert that "the trial court could reasonably infer from the testimony and evidence presented" of the Intersection's "nature and location," that it "had nonetheless been used by the public for twenty years."

20

Abundant evidence was presented at trial, Appellees insist, establishing that Victoria Drive extends through the Intersection. Appellees point to the testimony by County officials that the County had performed maintenance on the Intersection after it was "upgraded to a public road in 1995"; that the two properties situated adjacent to the Intersection have Victoria Drive addresses and were assessed for public improvements in 1995; and that the County installed a fire hydrant on the Stafford side of the Intersection at the "approximate line of demarcation between the County's maintenance of the Intersection and [Bay City's] maintenance of Stafford Road."

Finally, Appellees contend that the public use of the Intersection in this case has been "by acquiescence" and therefore adverse. (Quoting *Garrett*, 258 Md. at 375). "The *Garrett* court made clear[,]" Appellees argue, "that '[m]ere failure to protest" the hostile claim of another "is not permission but acquiescence." (Quoting *id.* at 377).

**Legal Framework**

A declaratory judgment "generally is a discretionary type of relief." *Converge Servs. Grp., LLC v. Curran*, 383 Md. 462, 477 (2004). Section 3-409 of the Courts and Judicial Proceedings Article of the Maryland Code authorizes trial courts to enter declaratory judgments and provides, in relevant part:

> (a) Except as provided in subsection (d) of this section, a court may grant a declaratory judgment or decree in a civil case, if it will serve to terminate the uncertainty or controversy giving rise to the proceeding, and if:
>> (1) An actual controversy exists between contending parties;
>> (2) Antagonistic claims are present between the parties involved which indicate imminent and inevitable litigation; or
>> (3) A party asserts a legal relation, status, right, or privilege and this is challenged or denied by an adversary party, who also has or asserts a concrete interest in it.

21

Maryland Code (1974, 2020 Repl. Vol.), Courts and Judicial Proceedings Article ("CJP"), § 3-409.

Whether the "use of [a] disputed area establish[es] a prescriptive easement, is a legal question involving the interpretation of Maryland case law" that we review without deference. *Turner v. Bouchard*, 202 Md. App. 428, 442 (2011). *See also Webb v. Nowak*, 433 Md. 666, 681 (2013) ("The interpretation of mortgages, plats, deeds, easements and covenants has been held to be a question of law."). We also review the question of "whether the circuit court *properly assigned* the burden of proving the elements of a prescriptive easement" *de novo*. *Turner*, 202 Md. App. at 443 (emphasis added). However, a trial court's *finding* that a party did or did not "carry the burden of showing a permissive use [is] a factual determination," *id.*, as is the court's ultimate determination of whether there has been an adverse use. *See Forrester v. Kiler*, 98 Md. App. 481, 487-88 (1993); 4 Tiffany Real Prop. § 1213 (3d ed.) ("The determination of whether there has been an adverse use is a question of fact[.]"). Therefore, on these matters, we give due regard to the trial court's role as factfinder as we review the court's factual determinations "under the clearly erroneous standard." *Turner*, 202 Md. App. at 443 (citation omitted).

In Maryland, "public roads are established by: (1) public authority, (2) dedication, or (3) prescriptive easement." *Bd. of Cnty. Comm'rs of St. Mary's Cnty. v. Aiken*, 483 Md. 590, 623-24 (2023) (citing *Clickner v. Magothy River Ass'n Inc.*, 424 Md. 253, 269 (2012)) (citation omitted). Government authorities may create a public road by "public authority"—that is, through condemnation proceedings and its mechanism of eminent domain. *Id.* at 624 (footnote omitted). This case does not involve the establishment of a

22

public road by public authority because there were no condemnation proceedings by which the County acquired the Intersection. *Id.* at 624-25.

The second method—a dedication— requires an offer to dedicate and an acceptance of that offer, and "no particular form or ceremony is necessary" to create a public road by dedication. *Id.* at 626 (quoting *Smith v. Shiebeck*, 180 Md. 412, 419 (1942)). Here, the parties, who were unable to agree that in 1995 the intention was to convert the Intersection to a public road, were able to agree that the issue before the circuit court was whether a public road was established under the third method—an easement by prescription.

### Easement by Prescription

Maryland courts have long held that it is possible to establish the existence of a public way by "evidence of an uninterrupted use[] by the public for twenty years" because of "the presumption [] that such long continued use and enjoyment by the public of such way had a legal rather than an illegal origin." *Mt. Sinai Nursing Home, Inc. v. Pleasant Manor Corp.*, 254 Md. 1, 6 (1969) (quoting *Thomas v. Ford*, 63 Md. 346, 351-52 (1885)). We have described this "long, uninterrupted use by the public as a road, for twenty years or more" as "bear[ing] so close an analogy to [prescription] that it is not inappropriate to apply to the right thus acquired the term prescriptive." *Wilkinson v. Bd. of Cnty. Comm'rs of St. Mary's Cnty.*, 255 Md. App. 213, 245-46 (2022) (quoting *Thomas*, 63 Md. at 351-52), *aff'd sub nom. Bd. of Cnty. Comm'rs of St. Mary's Cnty. v. Aiken*, 483 Md. 590 (2023). Such use "serves to give the owner notice" that in order to "dispute the rightfulness of the public use, the owner must assert his or her right within a statutory period by physical action or suit." 10A McQuillin Mun. Corp. § 30:23 (3d ed.). After such public use for that

period, "a perfect title by prescription . . . vests in the public." *Mt. Sinai Nursing Home, Inc.*, 254 Md. at 5 (citation omitted).

*Burden of Proof*

Because "[t]he purpose" of a quiet title action is to protect owners of legal title from being disturbed in the possession of their property and from "being harassed by suits in regard to [their] title by persons setting up unjust and illegal pretensions[,]" *Wilkinson*, 255 Md. App. at 259 (quoting *Porter v. Schaffer*, 126 Md. App. 237, 260 (1999)), "the plaintiff has the burden of establishing both possession and legal title by 'clear proof.'" *Porter*, 126 Md. App. at 260 (quoting *Stewart v. May*, 111 Md. 162, 173 (1909)). If the party seeking to quiet title establishes possession and legal title, and the opposing party raises the affirmative defense of adverse possession, then the burden shifts to the proponent of the adverse use "to show that it has had the character and is of the duration required by the law." *Dalton v. Real Estate & Improvement Co. of Balt. City*, 201 Md. 34, 41 (1952) (citing *Cox v. Forrest*, 60 Md. 74, 79 (1883)). Because the "use of a way over the lands of another whenever one sees fit, and without asking leave, is an *adverse* use," once such adverse use has been established, the responsibility shifts back to "the owner of the land, to show that the use of the way was by license or contract inconsistent with a claim of right." *Clickner*, 424 Md. at 280-81 (quoting *Cox*, 60 Md. at 79-80) (emphasis in original).

"[I]n order to rebut the presumption of adverse use," the owner "must do more than merely *present* evidence of permission—he or she must *prove* its existence by affirmative evidence." *Mavromoustakos v. Padussis*, 112 Md. App. 59, 68 (1996). Therefore, "once it is established that a presumption of adverse use applies in Maryland, the burden of

24

persuasion shifts to the servient owner, and remains there" and "[t]he trial court evaluates the evidence with that in mind." *Id.* at 69.

*Volume and Continuity of Traffic*

To establish a public way by prescription, the proponent must show "an adverse, exclusive, and uninterrupted use of another's real property for twenty years." *Banks v. Pusey*, 393 Md. 688, 699 (2006) (emphasis removed). "[T]he element of exclusivity necessarily functions differently in the context of public use." *Clickner*, 424 Md. at 278. The standard for a public easement obviously does not require that one person or group show exclusive use over the twenty-year period. Instead, as the Supreme Court of Maryland has instructed, "[p]ublic use requires that all persons must have an equal right to the use and that it must be in common, upon the same terms, however few the number who avail themselves of it. . . . as it is the right of public travel and not the exercise of the right which constitutes a road a public highway." *Garrett v. Gray*, 258 Md. 363, 378 (1970) (quoting *Dep't of Pub. Works & Bldgs. v. Farina*, 29 Ill.2d 474, 194 N.E.2d 209 (1963)) (internal citations omitted). *See* 39 Am. Jur. 2d *Highways, Streets, and Bridges* § 1 (stating that it is "the right of travel by all the world, and not the exercise of the right, which constitutes a road a public highway") (citing *City of Novi v. Robert Adell Children's Funded Tr.*, 473 Mich. 242, 251, 701 N.W.2d 144, 151 (2005)); *also* 4 Tiffany Real Prop. § 1212 (3d ed.) (stating the right to traverse "must not be confined to persons who can be identified or segregated from the members of the community as a whole, that is, use[] by the public does not mean use[] by certain specific members of the public").

The requirement that adverse use be uninterrupted or continuous also does not mean

25

that the use "must be exercised constantly and without any intermission[;]" rather, the requirement "may be satisfied by use 'with such frequency and constancy as to affect the landowner with notice that it is being exercised[.]'" *Zimmerman v. Summers*, 24 Md. App. 100, 108 (1975) (quoting 4 Tiffany Real Prop. § 1202 (3d ed.)). *See also Miceli v. Foley*, 83 Md. App. 541, 560 (1990) ("While continuity is an element of adverse possession, what is continuous for purposes of adverse possession depends greatly on the type of land at issue."); 4 Tiffany Real Prop. § 1212 (3d ed.) (stating "the public" means "all those who have occasion for the use[]," and "the amount of travel is immaterial"); 10A McQuillin Mun. Corp. § 30:29 (3d ed.) ("[U]se for the required period is the sole test; it is not a question of the frequency of the use.").

To acquire rights by prescription, "[d]aily use of the right of way is not required, but only that use normally resulting from the nature of the use itself. It is only required that a cessation of use not indicate a voluntary abandonment of the use by the person claiming it." *Clayton v. Jensen*, 240 Md. 337, 344-45 (1965). *See also Cox*, 60 Md. at 80 ("Nor does the law mean by 'an uninterrupted and continuous enjoyment,' that a person shall use the way every day for twenty years, but simply that he exercises the right . . . according to the nature of the use to which its enjoyment may be applied[.]").

*Adversity of Use*

When a non-owner "has used a right of way for twenty years unexplained, it is fair to presume that the use has been under a claim of right, unless it appears to have been by permission." *Garrett*, 258 Md. at 375 (quoting *Smith v. Shiebeck*, 180 Md. 412, 419 (1942)). *See also Day v. Allender*, 22 Md. 511, 526-27 (1865) (holding that if the "claim

26

of a way through enclosed and cultivated land" is "an invasion of property and a trespass[,]" then it is the exercise of "a privilege adverse to the right of property" and acquiescence or submission to it "may justify the inference of a legal right in the person who exercises the privilege"). "Mere failure to protest is not permission but acquiescence[,]" which is "the inactive status of quiescence or unqualified submission to the hostile claim of another[.]" *Dalton*, 201 Md. at 50 (quoting *Alstad v. Boyer*, 228 Minn. 307, 37 N.W.2d 376 (1949)).

The claim of right requirement "appears ordinarily to be satisfied by acts and circumstances of a character which serve to show that the use[] is adverse; as, for example, by exercising jurisdiction over the road, working it, or expending money in repairing it." 4 Tiffany Real Prop. § 1214 (3d ed.).[11] Further, "recognition by the municipal authorities . . . is the strongest sort of evidence that the use[] is not permissive merely." 4 Tiffany Real Prop. § 1217 (3d ed.). Our Supreme Court explained in *Shiebeck*,

> If, for example, a person throws open a passage through his land, and makes no effort to prohibit persons from passing through it, and does not show by any visible sign that he wishes to preserve his right over it, his action is a manifestation of an intention to dedicate the highway to public use and he is presumed to have so dedicated it.

---

[11] Other states have found that infrequent traffic by non-owners combined with public maintenance of the roadway can lead to a public easement by prescription. In one Alabama case, *Darby v. Robbins*, aerial photographs showed that an access road had existed on the property for more than forty years, and testimony proved that the road had been used by a neighbor, the neighbor's invitees, "mail carriers, garbage collectors and meter readers[,]" and had been "been graded on occasions by employees of the state or county road departments." *Darby v. Robbins*, 409 So. 2d 722, 723 (Ala. 1981). The trial court in *Darby* found this testimony sufficient to find that the "road has been in existence and use by members of the public, as well as [neighbors], for over forty years[,]" and was now a public road. *Id.* at 723-24.

180 Md. at 419-20. On the other hand, where owners of a private road permit their neighbors to use a road but do not allow the public at large to use it, those who use it by permission cannot gain a private easement by prescription thereby. *See Easter v. Overlea Land Co. of Balt. Cnty.*, 129 Md. 627, 632 (1917) (holding that "[t]he permissive use[] of the road" by neighbors of the owner "did not make it a public road"). Accordingly, in *Pennsylvania R. R. Co. v. Breeden*, although there was evidence of "an increase in the travel" over a section of private land, the Supreme Court held that no public way by prescription was created because, among other things, "there has never been any assumption of control, nor work, labor, care, or maintenance done or undertaken by the public authorities[,]" and because the "evidence [was] clear" that those using the lane were "warned by a sign posted along the roadside that the way is a private road[.]" 154 Md. 91, 97 (1928).

### *Garrett v. Gray*

In *Garrett*, the petitioners filed a complaint for injunctive relief in the Circuit Court for Prince George's County requesting that the court compel the Grays to reopen a "meandering dirt road," which they had barricaded after purchasing the property over which it ran. 258 Md. 363, 365 (1970). The dirt road in question ran from a public road, through the Gray farm, to its terminus at Osborne Road. *Id.* at 367. Twelve witnesses, including the Garretts and Wilkersons, who owned neighboring properties, testified that they had used the road across the Gray farm and that it was used by members of the public "from at least the year 1914." *Id.* at 368.

In reversing the trial court's determination that road was "a private way for [the

28

property owner's] friends going and coming in either direction[,]" the Supreme Court stated that the "testimony spells out the existence of a public way predicated on the uninterrupted use by the public for over twenty years." *Id.* at 370. The Court noted that members of the public had used the road "without objection from 1914 to 1961" and that while "traffic may have been sparse[,] nonetheless, members of the public freely passed over it without seeking permission of the owners through whose property the road passed, and it was a continued and uninterrupted use by persons other than the property owners whose property is traversed by the road." *Id.* at 378. On the question of permissive use, the Court further explained:

> The chancellor dismissed the user by the many witnesses who testified below as 'permissive use.' However, we think the use would more appropriately be characterized as use by 'acquiescence.' In *Dalton* [*v. Real Estate & Improvement Co. of Balt. City*, 201 Md. 34, 45 (1952)], *supra*, we said:
> . . . .
> '* * * Mere failure to protest is not permission but acquiescence. [4 Tiffany Real Prop. § 1196 (3d ed.)]. In *Alstad v. Boyer*, the Minnesota case cited above, the Court expressed it as follows (228 Minn. 307, 37 N.W.2d 372, 376 [1949]):
> 'Acquiescence is the inactive status of quiescence or unqualified submission to the hostile claim of another, and is not to be confused with permission, which denotes a grant of permission in fact or a license.'

*Id.* at 377-78. The Court concluded that the dirt farm road was a public way and that the chancellor erred in denying the petitioners' request for injunctive relief. *Id.* at 370.

### Analysis

#### *Burden of Proof*

Appellant Bay City brought suit to quiet title to the Intersection, and so initially it bore "the burden of establishing both possession and legal title by 'clear proof.'" *Porter*

*v. Schaffer*, 126 Md. App. 237, 260 (1999) (quoting *Stewart v. May*, 111 Md. 162, 173 (1909)). Here, Bay City satisfied this requirement when it produced original land records showing that both Victoria Drive and Stafford Road were owned by Bay City and attested that it did not dedicate the Intersection to the County at any time.

Thereupon, the burden shifted to Appellees to show the Intersection was in continuous use by the public for a period of 20 years, and thus was conveyed by prescription to the County. Once established, long continuous use by the public is presumed to be by claim of right—adverse to private ownership—a presumption that Bay City must rebut to defeat the prescriptive establishment of a public road. *See Clickner*, 424 Md. at 280-81. Therefore, Bay City was required to prove that the use was permissive in order to prevail where there was, as we explain below, evidence of continuous use by the public for a period greater than twenty years.

On appeal, Bay City argues that the trial court *must* have "based its decision on Bay City's failure to disprove the Appellees' claim of prescription[,]" because the court allegedly "did not rely on any actual evidence or testimony of adverse, exclusive, and uninterrupted use by the public for twenty years or more." Bay City claims that the court lacked evidentiary support for its finding that "the entire Intersection has continuously been traversed by members of the public as well as residents of Bay City, including by public utility vehicles, emergency vehicles, trash and delivery trucks, and other public vehicles." We disagree with Bay City's contention that the trial court impermissibly shifted the burden of proof in this case, and we decline its invitation to recast questions of fact as a question of law regarding burden of proof. As previously noted, we "will not set aside the

30

judgment of the trial court on the evidence unless clearly erroneous, and will give due regard to the opportunity of the trial court to judge the credibility of the witnesses." Md. Rule 8-131(c).

*Continuity of Public Use: Traffic*

Given the paucity of Maryland decisions that concern the creation of a public road by prescription, the circuit court in this case relied appropriately on the Maryland Supreme Court's opinion in *Garrett v. Gray*, 258 Md. 363 (1970). We recognize, as did the trial court below, that *Garrett* is immediately distinguishable from the case at bar with regard to the number of witnesses who testified to public travel through the Intersection. The claimants in *Garrett* produced twelve eyewitnesses who could testify to quantifiable trips along the farm road by specific persons within a given timeframe; whereas here, only three people testified about public travel through the Intersection.[12] *Id.* at 368.

Although compared to *Garrett* the testimony of three witnesses may seem sparse, the testimony of these witnesses was sufficient here because, as we discuss further below, there was evidence that the County has maintained the Intersection for a period of over twenty years. For one thing, it does not require a leap in fact or logic to conclude that the

---

[12] Mr. Dixon, managing member of Land Bridge, testified that during his visits through the Intersection he had never been told that he "shouldn't have been back there" because he was not "a resident or invitee" of Bay City. Mr. Sullivan, a Bay City board member, also testified that while the Intersection "was [not] heavily trafficked[,]" use by retail trucks making deliveries "would be common." Finally, Mr. Moore, the County's Chief Road Engineer, testified that in 1995, after a public hearing, the County "approve[d] the project" to upgrade the stretch of Victoria Drive to the County roads inventory, and that the County would have "beg[u]n maintenance immediately." He also testified that the roads were open to the public and accessible to mail delivery trucks, postmen, school buses, and guests.

31

public maintenance of Victoria Drive, including the Intersection, for over twenty years required numerous non-resident County employees and contractors to travel over and through the Intersection. Thus, in contrast to the witness testimony in *Garrett*, in this case the witnesses testified not just about their own personal use of the Intersection, but also to their knowledge of the public's use of the Intersection (i.e., delivery trucks), as well as the regular maintenance of the Intersection by the County government since 1995.

Depending on the circumstances, at least one Maryland opinion suggests, although only in *dicta*, that the testimony of a single witness may be sufficient to support a finding of continuous and uninterrupted use by the public for a period of twenty years. In *Mt. Sinai Nursing Home, Inc. v. Pleasant Manor Corp.*, a decision concerning a claim of public way by prescription, the Supreme Court of Maryland held that claimants had failed to supply evidence to "support [] a finding of the necessary continuous and uninterrupted use for twenty years" of the disputed land by the public. 254 Md. 1, 6-7 (1969). Among other theories advanced by the claimants that ultimately failed, they purported to prove that the subject passage "was used for twenty years between 1922 and 1942 by the public for travel by foot and by horse and automobile[,]" by the testimony of a single witness "who appear[ed] to have courted [the land owner's] daughter for seven or eight years before they were married and made frequent visits to the [land owner's] home before and after the marriage beginning in 1922[.]" *Id.* at 7. The Court observed that

> [The witness's] testimony perhaps would have been enough to sustain a finding by the trier of fact of the necessary public use except for the fact that it covered only a period of sixteen or seventeen years from 1922 on, [the witness] having lost all contact with the area after late 1938 or early 1939.

32

> There is not one word in the record as to the [p]eriod from 1938 or 1939 to
> 1942.

*Id.*

On the question of continuity, while we acknowledge that the witnesses here did not, as in *Garrett*, attest to quantifiable trips along the road by specific persons within a given timeframe, as mentioned above, "[t]he requirement that adverse use be continuous does not mean that the user must be exercised constantly and without any intermission[;]" rather, the requirement "may be satisfied by use 'with such frequency and constancy as to affect the landowner with notice that it is being exercised.'" *Zimmerman v. Summers*, 24 Md. App. 100, 108 (quoting 4 Tiffany Real Prop. § 1202 (3d ed.)). Moreover, we are mindful of the instruction from *Garrett* that "it is the right of public travel and not the exercise of the right which constitutes a road a public highway." 258 Md. at 378 (citation omitted). The *Garrett* Court emphasized that even where "traffic may have been sparse[,]" it was the condition that "members of the public freely passed over it *without seeking permission of the owners*" that constituted "continued and uninterrupted use by persons other than the property owners[.]" *Id.* (emphasis added). *Cf. Miceli v. Foley*, 83 Md. App. 541, 560 (1990) (holding that claimant's consistent use of the property as a storage area between periods of active use was sufficient to provide the continuity required for adverse possession, because "what is continuous for purposes of adverse possession depends greatly on the type of land at issue").

### Continuity of Public Use: Improvements and Maintenance

It is uncontested that the County performed considerable construction on Victoria Drive to convert it to a public road in the late 1990's. After holding a public hearing on

April 19, 1995, the Planning Commission approved the project to bring Victoria Drive and several other Bay City roads up to County standards and "added that section into [the County's] inventory." At trial, Mr. Moore testified that the County's construction work began in July 1995, and an ordinance to levy the special assessment charges for the project went into effect in March 1998. He also confirmed that the County installed a fire hydrant at the end of Victoria Drive and provided water and sewage services to Bay City. He testified to the location of the fire hydrant using a street-level photograph that was entered into evidence, showing the hydrant just beyond the Intersection on the south side of Stafford Road. He explained that the new utilities would need to pass underneath the Intersection to connect to the hydrant. The location of the fire hydrant alone supports the trial court's conclusion that the upgrade to Victoria Drive in the late 1990's included the Intersection.

In her Memorandum Opinion and Order, the trial court judge found that when the County repaved Victoria Drive in 2015, the "repaving extended throughout the Intersection and around the corner onto Stafford Road" with Bay City's acquiescence, and that "[u]ntil the filing of the Complaint in this action, Bay City made no efforts to assert control over the Intersection." This finding is supported by Mr. Dreisedel's testimony that when the County resurfaced the Intersection with slurry seal in 2015, the County covered over tar and chip paving that Bay City had installed as part of its resurfacing of Stafford Road. Also, at trial Mr. Moore used aerial and street-level photographs to show that the County's resurfacing of Victoria Road in 2015 extended through the Intersection.

Mr. Dreisedel and Mr. Moore testified that the County maintains Victoria Drive by

34

providing stormwater management and snow removal. According to their testimony, as of April 1995, the County considered Victoria Drive a county road and responded to motorists in need of assistance. They explained that the County performed significant construction during the next three years that extended into the Intersection and began regular maintenance no later than 1998. The County further resurfaced the Victoria Drive in the late 2000's, and again in 2015, encompassing the Intersection in the work. The trial judge found that Bay City failed to assert control over the Intersection even though the County's actions of resurfacing, maintaining, and plowing the Intersection gave Bay City ample notice that the County considered it to be a public road.

We hold that the trial court's finding that the Intersection had been in continuous public use for at least twenty years is fully supported by the testimony of several witnesses that they, and other members of the public, travelled freely through the Intersection without having to request permission, and by the testimony and exhibits demonstrating that the County has improved and maintained the Intersection since 1995.

*Adversity of Use*

We return to the decision in *Garrett v. Gray*, in which the Court invoked the "familiar principle" that "the use of a way whenever one sees fit over the land of another, without asking leave is an adverse use, and the burden is upon the owner of the land to show that the use of the way was by license or contract inconsistent with a claim of right." 258 Md. at 375 (quoting *Smith v. Shiebeck*, 180 Md. 412, 419 (1942)). In *Garrett*, the Court described the witnesses' testimony of traversing the road "without objection" and "without seeking permission of the owners through whose property the road passed[,]" as

35

"use by acquiescence" rather than "permissive use." *Id.* at 377, 378.

Likewise, in the instant case, Appellees presented some evidence that members of the public had traversed the Intersection in conjunction with their use of Victoria Drive, whenever they saw fit, and without asking leave of Bay City.

As we addressed above, because such unchallenged use without permission is presumptively adverse to private ownership, *see Clickner v. Magothy River Ass'n Inc.*, 424 Md. 253, 280-81 (2012), to rebut that presumption, the owner "must do more than merely *present* evidence of permission—he or she must *prove* its existence by affirmative evidence." *Mavromoustakos v. Padussis*, 112 Md. App. 59, 68 (1996). There is no evidence in the record of any member of the public asking permission, paying a fee, or believing permission could be withheld with regard to their use of the Intersection. The trial court found that "no signage has ever been placed at the Intersection indicating any restriction on its use[,]" and Bay City had never restricted public use with "barricades . . . or other restrictions[.]" This finding is supported in the record by the courtroom testimony of Mr. Dixon, managing member of Land Bridge, who asserted that there was no signage at the Intersection limiting access by "people from outside the community[,]" and the trial testimony of Mr. Moore, the County's Chief Road Engineer, in which he said, "I have never seen a sign restricting anything" in Bay City.

Because Maryland decisional law includes few cases concerning the establishment of a public way by prescription, we may consult decisions concerning the doctrine of

adverse possession.[13]  In *Senez v. Collins*, fixed improvements to the contested property,

as well as maintenance, supported a finding that the claimant established the adversity of

her possession.  182 Md. App. 300, 328 (2008).  There:

> Both [claimant and predecessor in privity] engaged in basic yard work and maintenance over the disputed area. [Predecessor] constructed the boat ramp in its entirety, and constructed the wooden bulkhead along the north side of the boat ramp, entirely within the disputed area, to prevent erosion of the land. After [claimant] purchased the [adjacent] property from the [predecessor], she constructed a privacy fence bordering the disputed area and a gate to prevent her dogs from using the boat ramp to enter the creek. She also repaired and extended the boat ramp by pouring additional concrete.

*Id.*  We held that a claimant's "[p]ossessory acts of dominion over land may be sufficient

to charge the record owner with knowledge that the land is adversely possessed."  *Id.* at

325 (quoting *Miceli*, 83 Md. App. at 561).  Pertinent to the instant case, we also held that

"[w]hen an adverse claimant has used the disputed land in the same manner as adjacent

land she owns by title, such acts are, if anything, *further* evidence of actual possession."

*Id.* at 330.

In the instant case, it is undisputed that beginning sometime in 1995, the County

performed the initial construction to run utilities under the Intersection and upgrade

---

[13] The Maryland Supreme Court has observed that the doctrines are so "markedly similar" that it has "rel[ied] on, as instructive, law concerning adverse possession in a case involving a prescriptive easement" to discuss adverse use and hostility. *Breeding v. Koste*, 443 Md. 15, 36 (2015) (citing *Banks v. Pusey*, 393 Md. 688, 709 (2006)).  In *Breeding*, the Supreme Court concluded that the "woodlands exception" to the finding of a prescriptive easement, under which there is "a legal presumption that the use is by permission of the owner" where land is "unimproved or in a general state of nature," applies equally to claims of adverse possession because "the case law between the two is consistent to the point at which we are satisfied that extending the 'woodlands exception' to adverse possession cases is the logical, common sense course of action." *Id.* at 29-30, 36.

Victoria Drive to meet county road standards. Ever since the County began maintenance of Victoria Drive and placed the fire hydrant on the Stafford side of the Intersection in the late 1990s, Bay City was sufficiently on notice that the County was taking dominion and control of the Intersection. We conclude that, because Bay City did nothing to assert its own dominion or control over the Intersection, its failure to stop the County from using taxpayer funds to maintain the Intersection was acquiescence; in other words, it was an "unqualified submission to the hostile claim of another, [] not to be confused with permission, which denotes a grant of permission in fact or a license." *Garrett*, 258 Md. at 377-78 (citation omitted).

**JUDGMENT OF THE CIRCUIT COURT FOR QUEEN ANNE'S COUNTY AFFIRMED; COSTS TO BE PAID BY APPELLANT.**

38